# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 1, 2008

Charles R. Fulbruge III
Clerk

No. 06-60289

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ROBERT J LUCAS, JR; BIG HILL ACRES INC; CONSOLIDATED INVESTMENTS INC; ROBBIE LUCAS WRIGLEY; M E THOMPSON JR

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge.

I

Defendants sold house lots and designed and certified septic systems on wetlands but represented the lots as dry. Septic systems on the lots failed, causing waste discharges. The Government charged the corporate developer and various individuals with Clean Water Act (CWA) violations, mail fraud, and

conspiracy to commit mail fraud and to violate the CWA. A jury found Defendants guilty on all counts.[1] Defendants appealed.

II

Robert J. Lucas owned Big Hill Acres, Inc. (BHA, Inc.) and Consolidated Investments, Inc. Through these companies, he acquired Big Hill Acres (BHA), a large parcel of land in Jackson County, Mississippi approximately eight miles from the Gulf of Mexico. He subdivided the property and sold mobile home lots under long-term installment plans. The property was not connected to a central municipal waste system, and County law required Lucas to certify and install individual septic systems on each lot before they could establish electric hook-ups or sell the lots. In Jackson County, septic systems must be approved by an engineer with the Mississippi Department of Health (MDH) or by an independent licensed engineer. Lucas initially hired an MDH engineer to approve septic systems, but MDH withdrew many of its initial approvals when it found that the lots were on saturated soils. Lucas then hired a private licensed engineer, M.E. Thompson, Jr., to approve and certify the septic systems. Robbie Lucas Wrigley, Lucas's daughter, advertised the lots, showed them to prospective buyers, and leased them.

The Army Corps of Engineers, the EPA, the MDH, and the Mississippi Department of Environmental Quality (DEQ) became concerned that Defendants were selling house lots and installing septic systems on wetlands. These agencies issued several cease and desist orders against Lucas and Thompson,[2]

---

[1] Not every count included all Defendants. See infra note 3.

[2] A July 15, 1997, letter from MDH to Thomspon indicated that he must "either fully comply with the statutes when designing systems, or cease and desist immediately." A June 3, 1999, cease and desist order from the Army Corps of Engineers told Lucas that unpermitted placement of dredged or fill material into wetlands violated the CWA and ordered him to cease and desist constructing homes in a subdivision near Vancleave, Mississippi. An August 4, 1999, administrative order from the EPA notified Lucas that placement of fill into wetlands without a permit violated the CWA and ordered him to cease and desist from unpermitted

and the EPA sent letters to residents and organized a meeting of the residents to warn them of lot conditions and to tell them where wetlands were located on the property. It also met with BHA's counsel to attempt to designate the areas where they would allow development. These efforts were not fully successful.

The Government filed a 41-count indictment against Defendants in June of 2004 and then a superseding indictment, charging filling of wetlands without a Section 404 permit from the Corps, failing to obtain Section 402 National Pollutant Discharge Elimination System (NPDES) Permits for the septic tanks, mail fraud, and conspiracy to commit mail fraud and to violate Sections 402 and 404 of the CWA.[3] The district court denied pre-trial motions to dismiss the CWA charges. After the Government concluded its case, the court denied a joint motion for judgment of acquittal for all counts, except for counts 30-35 charging violations of the CWA. After a weekend recess and an argument from the Government that granting the motion would preclude appeal, the court reversed the acquittal. A jury convicted Defendants on all counts, and the court denied Defendants' joint motion to vacate the verdict, enter a judgment of acquittal on all counts, or to order a new trial. The court sentenced Lucas, Wrigley, and Thomas to prison terms; placed BHA, Inc. and Consolidated Investments on probation; and ordered all Defendants to pay restitution, special assessments, and fines.

---

filling.

[3] Count 1 charged all Defendants with Conspiracy to defraud buyers using the U.S. mails and conspiracy to violate the CWA; Counts 2-18 charged Lucas, Wrigley, Thompson, and BHA, Inc. with mail fraud; Count 19 charged Lucas, Wrigley, and BHA, Inc. with mail fraud; Counts 20-22 charged Lucas with violating Section 404 of the CWA; Counts 23-26 charged Lucas, Wrigley, and Thompson with violating Section 404 of the CWA; Counts 27-29 charged Lucas with violating Section 404 of the CWA; Counts 30-32 charged Lucas, Wrigley, and Thompson with violating Section 402 of the CWA; Counts 33-39 charged Lucas and Wrigley with violating Section 402 of the CWA; and Counts 40-41 charged Lucas with violating Section 402 of the CWA.

III

A

The first and overarching question is jurisdiction – whether the jury was properly required to find that the property at issue was subject to the CWA. Lucas, BHA, Inc., and Consolidated Investments, Inc., as well as Wrigley in adopting all arguments in Lucas's brief and Thompson in adopting the CWA jurisdiction issues raised in Lucas's brief, urge that the jury instructions failed to require the jury to find that the wetlands were "waters of the United States" and in refusing its requested charge. The instructions stated in relevant part,

> The term navigable waters means waters of the United States. Whether a body of water is navigable-in-fact is determined by whether it is used or susceptible of being used in its natural and ordinary condition as a highway for commerce over which trade and travel are, or may be, conducted in the customary modes of trade and travel on water.

> The term wetlands means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. . . . Not all wetlands fall under the protection of the Clean Water Act. However, wetlands that are waters of the United States are protected by the Clean Water Act. Wetlands are considered waters of the United States if they are adjacent to a navigable body of open water. Wetlands are adjacent to a navigable body of water if there is a significant nexus between the wetlands in question and a navigable-in-fact waterway. Some of the factors which you may wish to consider in determining whether there is a significant nexus include, but are not limited to: . . . flow rate of surface waters from the wetlands into a navigable body of water . . . evidence of any past or present contamination of a navigable body of water attributable to the discharge of pollutants on the wetlands . . . when, or to what extent, contaminants from the wetlands have or will affect a navigable body of water . . . .

Defendants argue that the court erred in not including their requested language that

> The Clean Water Act does not permit the federal government to impose regulations over tributaries that are neither themselves navigable nor truly adjacent to navigable waters . . . adjacency implicates a 'significant nexus' between the water in question and the navigable in fact waterway. If the government fails to prove beyond a reasonable doubt that the wetlands at issue in this case are in fact navigable or truly adjacent to i.e. lying near, close, contiguous, or adjoining a navigable waterway, you must find the defendants not guilty on counts Twenty through Forty-One.

They allege that the instructions, which did not include their proposed language, were in error because they "could have lead the jury to believe that they could find Defendants guilty under the CWA even if they found no significant nexus."[4]

We review alleged error in jury instructions for an abuse of discretion, reversing "only when 'the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'"[5] A district court abuses its discretion in omitting a requested jury instruction only if the requested language "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."[6]

The court's instructions were not in error, nor was the court's omission of Defendants' requested instructions. The court's instructions required that the jury find that the wetlands were waters of the United States adjacent to navigable waters with a significant nexus between the wetland and the

---

[4] Defendant Lucas's Brief at 55.

[5] Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 168 (5th Cir. 2000) (quoting McCullough v. Beech Aircraft Corp., 587 F.2d 754, 759 (5th Cir. 1979)).

[6] United States v. Simkanin, 420 F.3d 397, 410 (5th Cir. 2005).

navigable-in-fact waterway to establish CWA jurisdiction. The instructions substantially covered Defendants' requested instructions by requiring adjacency[7] as defined by a significant nexus. The closing arguments also included the "significant nexus" language. The Government argued

> [T]he government has shown that there is a significant nexus between the wetlands on Big Hill Acres and navigable-in-fact waters. Showed that the surface from the Big Hill Acres site drains in three directions. The western portions of the site drain into Bayou Costapia. Bayou Costapia empties into the Tchoutacabouffa River, which then empties into the Gulf of Mexico. The central portions of the Big Hill Acres development drained through tributaries into Old Fort Bayou Creek. And Old Fort Bayou Creek connects to Old Fort Bayou, which is a protected coastal preserve empyting into the Gulf of Mexico. And the eastern portions drain into the headwaters of Little Bluff Creek, which then connects to Bluff Creek, which flows into the Pascagoula River and on to the Gulf of Mexico. And what we also demonstrated was that you could walk on wetlands from any one of these three areas on Big Hill Acres all the way to the navigable-in-fact waters.

Defendants also emphasized the need for a significant nexus finding in their closing arguments. Lucas's attorney argued, "And if you find that the land at Big Hill Acres is not adjacent to a navigable-in-fact body of water, does not have a significant nexus to a navigable water, you should return a verdict of not guilty on all the Clean Water Act counts." The court did not abuse its discretion in giving the CWA instructions.[8]

---

[7] The term "adjacent" is substantially similar to Defendants' requested term of "truly adjacent."

[8] Defendants do not challenge the instructions on the grounds that they failed to include the Rapanos v. United States standard for navigable waters. This is understandable. The Rapanos plurality requires a channel adjacent to a wetland to be adjacent to "a relatively permanent body of water connected to traditional interstate navigable waters" to constitute "waters of the United States," 126 S.Ct. 2208, 2227 (2006), and the Rapanos concurrence requires a "significant nexus" between the wetlands and the navigable waters, meaning that "wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more

B

The second jurisdictional question is the sufficiency of the evidence supporting the jury finding that the CWA reaches this property. All Defendants argue that there is insufficient evidence to establish jurisdiction under the CWA. "Our review of the sufficiency of the evidence supporting a conviction is narrow: we will affirm if a rational trier of fact could have found that the evidence established the essential elements of the crime beyond a reasonable doubt."[9]

Under the CWA, the United States has jurisdiction over the "waters of the United States,"[10] i.e., navigable waters. Wetlands adjacent to certain navigable waters are waters of the United States.[11] Rapanos addressed wetlands adjacent to navigable waters and the tributaries of navigable waters, determining the types of adjacent tributaries and waters that count as waters of the United States and the connection that wetlands must have to these waters to fall under federal jurisdiction. The four-justice plurality defined waters of the United

---

readily understood as navigable." 126 S.Ct. at 2248 (Kennedy, J., concurring). The instructions contained elements of both the plurality and concurring opinions by requiring the jury to find that the wetlands were "adjacent to a navigable body of open water," meaning "there is a significant nexus between the wetlands in question and a navigable-in-fact waterway." The judge instructed the jury to consider "flow rates of surface waters from the wetlands into a navigable water," an element similar to the connection required by the Rapanos plurality, and to consider "whether there is evidence of when, or to what extent, contaminants from the wetlands have or will affect a navigable water," an element similar to the concurrence's significant nexus standard.

[9] United States v. Davis, 226 F.3d 346, 354 (5th Cir. 2000).

[10] 33 U.S.C. § 1362(7).

[11] See. e.g., United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985) ("We cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the 'waters' of the United States -- based as it is on the Corps' and EPA's technical expertise -- is unreasonable."); Rapanos, 126 S.Ct. at 2217 (recognizing that subsequent cases limiting federal jurisdiction over certain waters have not overrruled Riverside Bayview).

States, as "relatively permanent, standing or flowing bodies of water,"[12] concluding that

> establishing that wetlands . . . are covered by the Act requires two findings: First, that the adjacent channel contains a "wate[r] of the United States," (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins. [13]

The plurality did not define "relatively permanent," finding that "we have no occasion in this litigation to decide exactly when the drying-up of a stream bed is continuous and frequent enough to disqualify the channel . . . ."[14]

Its adjacency standard finds its roots in Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers ("SWANCC").[15] SWANCC did not involve wetlands but held that "nonnavigable, isolated, intrastate waters" such as "an abandoned sand and gravel pit" were not waters of the United States.[16] The Rapanos plurality recognized that the Act allows states under delegated federal authority to regulate"wetlands adjacent" to "navigable waters . . . other than those [navigable waters] which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce," and that SWANCC

---

[12] 126 S.Ct. at 2221.

[13] Id. at 2227.

[14] Id. at 2221 n.5.

[15] 531 U.S. 159 (2001).

[16] Id. at 162.

was not to the contrary.[17] In other words, the Government has jurisdiction over waters that neighbor tributaries of navigable waters.[18]

The evidence presented at trial is sufficient by the plurality's measure of federal waters. One of the Government's expert witnesses at trial, Mike Wylie, described how he began at the westernmost drainage of the property and moved across, finding "flowing open water" north of the site and boat points on the western portion of the property "at the confluence of two tributaries." These tributaries had "strong flow" and "high velocity." Wylie showed photographs of his staff kayaking in tributaries connected to BHA wetlands as well as in several wetlands on the property. A jury could have reasonably concluded that these pictures show areas on the edge of the BHA property where "it is difficult to determine where the 'water' ends and the 'wetland' begins."[19] The Government maps of Big Hill Acres presented at trial also show Fort Bayou Creek, Bayou Costophia, tributaries to Bayou Catophia, and tributaries to Little Bluff Creek all connected to the development property, and all eventually flowing into the navigable Tchoutachabouffa River, the Pascagoula River, and the Mississippi Sound. Expert Peter Stokely testified that "there is a continuous band of wetlands and streams and creeks that lead from the site to the waters," and showed aerial photographs of "drainage and wetlands patterns on the site" as well as drainage and wetlands patterns that "branch up towards the site" and that lead "up on to the property itself."

The evidence presented at trial is also sufficient by the measure of federal waters offered by the concurring justices. They concluded that the applicable

---

[17] 126 S. Ct. at 2220.

[18] The definition includes wetlands that neighbor tributaries of navigable waters because the plurality definition includes wetlands adjacent to "a relatively permanent body of water connected to traditional interstate navigable waters." Id. at 2227 (emphasis added).

[19] Id. at 2227.

standard should be the "significant nexus," evoking whether "wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable."[20] The Government presented evidence that the BHA wetlands control flooding in the area and prevent pollution in downstream navigable waters, evidence supporting the significant nexus standard of the Rapanos concurrence.

A four-justice dissent found that United States v. Riverside Bayview Homes, Inc.[21] controls the definition of waters of the United States and the Supreme Court should defer to "the Corps' judgment that treating adjacent wetlands as 'waters' would advance the 'congressional concern for protection of water quality and aquatic ecosystems."[22] The evidence of flood and pollution control provided by the BHA wetlands is sufficient by this measure, as well.

In sum, the evidence presented at trial supports all three of the Rapanos standards and the jury's finding that Lucas, Thompson, and Wrigley were "guilty beyond a reasonable doubt" "of knowingly causing the discharge of pollutants from a point source into waters of the United States without a permit as required by Section 404" of the CWA; that Lucas, Thompson, and Wrigley were guilty of "knowingly causing the discharge of pollutants from a point source; to wit, a septic system on [various lots], into waters of the United States without a permit as required by . . . Section 402" of the CWA; and that all Defendants were guilty "of conspiracy to commit an offense against the laws of the United States in violation of Title 18, United States Code, Section 371 . . . as alleged in Count 1 of the indictment," alleging, inter alia, that all Defendants

---

[20] Id. at 2248 (Kennedy, J., concurring).

[21] 474 U.S. 121 (1985).

[22] 126 S. Ct. at 2244 (Stevens, J., dissenting).

"caused the discharge of sewage into wetlands that are waters of the United States" and "caused the discharge of pollutants into wetlands that are waters of the United States."

C

Finally, Defendants challenge the jurisdictional elements of the CWA charges on the basis that the "CWA as applied to the regulation of wetlands is unconstitutionally vague" and that "jurisdiction [under the Act] continues to be determined on an ad hoc basis."[23] The district court denied their pretrial motion on vagueness. We review this denial de novo.[24] Multiple agencies had warned Defendants that they were violating the CWA and state law by installing septic systems and dredging in federal waters.[25] This does not end our inquiry, as Defendants allege that they disputed the agencies' interpretation of the Clean Water Act.

Even in the absence of disputed agency warnings, the prevalence of wet property at BHA and an area network of creeks and their tributaries leading to the Gulf, some of which connected to wetlands on the property, should have alerted "men of common intelligence"[26] to the possibility that the wetlands were

---

[23] Defendant Lucas's Brief at 38.

[24] United States v. Nevers, 7 F.3d 59, 61 (5th Cir. 2003) (reviewing de novo the question of unconstitutional vagueness); Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs, 493 F.3d 570, 575 (5th Cir. 2007) (reviewing de novo denial of a motion to dismiss).

[25] The District Health Officer for the Jackson County office of MDH informed Thompson in 1997 that the septic systems that he approved in wetland soils violated state law. On June 3, 1999, the Corps of Engineers issued a cease and desist letter ordering Lucas to stop putting filled or dredged material into wetlands. On August 4, 1999, an EPA Administrative Order ordered Lucas to stop fill activity at BHA. On October 27, 1999 the Mississippi DEQ sent a letter to Lucas indicating that he was violating the CWA. On July 26, 2000 the EPA issued another cease and desist letter.

[26] Ford Motor Co. v. Tex. Dept. of Transp., 264 F.3d 493, 507 (5th Cir. 2001).

waters of the United States under the CWA. As we found in Avoyelles Sportsmen's League, Inc. v. Marsh,

> the landowners were well aware that at least a significant portion of their land was a wetland; if they wished to protect themselves from liability they could have applied for a permit and thus obtained a precise delineation of the extent of the wetland, as well as the activities permissible on the land.[27]

At trial, the Government presented evidence that one of Lucas's employees told Lucas that the property might contain wetlands, and that the property might be regulated.[28] Another employee also testified that he had warned Lucas that the property was wet.[29] Furthermore, the Government produced evidence that the language in the deeds conveying property from a timber company to Big Hill Acres indicated that the land was subject to "[w]etlands, environmental, hazardous or solid waste and flood plain laws, rules, and regulations affecting said property," while another deed from Robert Lucas to Big Hill Acres was a special warranty deed "with language saying any property which may constitute

---

[27] 715 F.2d 897, 917 (5th Cir. 1983).

[28] Direct Examination of John Mizelle. Q: "But when you were working for Mr. Lucas in doing the work you described, you told him that there might be a problem here and you knew about it; right?" A: "Possibly yes, sir." Q: "And that problem was that you were working in wetlands and thought you were; is that correct?" A: "I thought I was, yes, sir." Q: "And you raised that issue with Mr. Lucas?" A: "At one point, yes, sir." * * * Q: "So you explained to Mr. Lucas that the county [at another job that Mr. Mizelle worked on, unrelated to BHA] had gotten in trouble and had been fined for digging, trenching, side casting in wetlands, is that correct?" A: "Well, yes and no. I mean, [at the county job] I was working strictly in the water – in the running creek or running bayou. It's totally different." Q: "But you explained – you explained that there were" A: "We [the county] did get fined, yes, sir." Q: "And you explained that to Mr. Lucas??" A: "Yes, sir." Q: "And you explained that in the context because you were working in an area that you thought might be regulated in the same way; is that correct?" A: "It might be, yes." Q: "And that's why you raised it with Mr. Lucas – " A: "Yes, sir." Q: "–is that correct? So you had a concern about it, and you raised that concern that maybe you were working in wetlands with Mr. Lucas; correct?" A: "Right."

[29] Direct Examination of Phillip Johnson.

coastal wetlands as defined in the coastal wetland protection law is conveyed by quitclaim only." The district court did not err in denying the vagueness motion.

IV

A

We now turn from the jurisdictional question of whether the wetlands were waters of the United States, to challenges to the sufficiency of the indictment and the instruction to the jury regarding the CWA's NPDES permitting requirements. We first address the challenges to the sufficiency of the indictment with respect to the charges for discharging pollutants from septic systems into waters of the United States without an NPDES permit.

Counts 30-41 of the superseding indictment charged some of the Defendants with "knowingly caus[ing] pollutants, including sewage and domestic wastewater, to be discharged from a septic system, a point source, into wetlands that are waters of the United States without a permit issued under the authority of Section 402 of the Clean Water Act."[30]

Defendants challenge the sufficiency of the indictment with respect to the Section 402 charges, arguing that "[b]ecause the regulation [enacting Section 402] unambiguously excludes septic tanks from the definition of 'treatment works treating domestic sewage,' Defendants were not legally required to obtain an NPDES permit, and therefore did not violate CWA Section 402."[31] Defendants moved to dismiss these counts before trial, arguing that "[t]he CWA regulations require a Section 402 permit for point source discharges and for 'treatment works treating domestic sewage.' An individual on-site septic system

---

[30] Counts 30-32 charged Lucas, Wrigley, and Thompson; Counts 33-39 charged Lucas and Wrigley, and Counts 40-41 charged Lucas.

[31] Defendant Lucas's Brief at 33.

is neither a 'point source' nor a 'treatment works treating domestic sewage.'"[32] The Government counters that "Defendants [on appeal] do not dispute that the release of sewage from septic tanks constitutes the discharge of a pollutant from a point source."[33]

Even if Defendants abandoned their argument that septic systems are not a point source, and it appears they have not, there remains the broader argument that the indictment is insufficient because Section 402 NPDES permitting requirements do not apply to individual septic systems. Because the NPDES program requires permits for point source discharges and for certain treatment works, the definition of a point source is inherent to the applicability of NPDES permitting to septic systems.

40 C.F.R. § 122 and Sections 123 and 124, "implement the National Pollutant Discharge Elimination System (NPDES) Program under sections 318, 402, and 405 of the Clean Water Act (CWA)." Section 122.1(b) addresses the "Scope of the NPDES permit requirement" and defines the NPDES permitting requirement for point sources, stating,

> The NPDES program requires permits for the discharge of "pollutants" from any "point source" into "waters of the United States." The terms "pollutant", "point source" and "waters of the United States" are defined at § 122.2.

Section 122.2 defines these terms, in relevant part, as follows:

> Point source means any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged.

---

[32] Memorandum in Support of Motion to Dismiss Clean Water Act Courts (30-41) For Failing to Charge an Offense, at 3-4.

[33] Government's Brief at 51.

Pollutant means dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials (except those regulated under the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.)), heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. It does not mean:

(a) Sewage from vessels; or

(b) Water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil and gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if the State determines that the injection or disposal will not result in the degradation of ground or surface water resources.

After defining the scope of NPDES permitting to apply to any point source discharging a pollutant into waters of the United States, Section 122.1(b)(2) describes other sources (treatment works) that must meet additional sewage sludge requirements as part of the NPDES permitting process. Section 122.1(b)(2) provides,

The [NPDES] permit program established under this part also applies to owners or operators of any treatment works treating domestic sewage, whether or not the treatment works is otherwise required to obtain an NPDES permit, unless all requirements implementing section 405(d) of the CWA applicable to the treatment works treating domestic sewage are included in a permit issued under the appropriate provisions of subtitle C of the Solid Waste Disposal Act, Part C of the Safe Drinking Water Act, the Marine Protection, Research, and Sanctuaries Act of 1972, or the Clean Air Act, or under State permit programs approved by the Administrator as adequate to assure compliance with section 405 of the CWA.[34]

---

[34] Emphasis added.

Treatment works under § 122.1 (b)(2) do not include septic systems.[35] Thus, the NPDES permitting requirement applies to two types of sources – point sources and treatment works. The Government urges that septic systems that discharge waste directly into federal waters of the United States are point sources and thus subject to the first permitting requirement under § 122.1(b)(1). Defendants, on the other hand, argue that privately-owned septic systems are not subject to NPDES permitting requirements, impliedly arguing that they are neither point sources nor treatment works.

The crux of Defendants' argument is that because septic systems are not treatment works under § 122.1(b)(2), they cannot be subject to NPDES permitting. But as the Government argues, treatment works are defined separately from point sources in the regulation: point sources are subject to the permitting requirement, and certain treatment works are additionally subject to these requirements. In other words, because § 122.1(b)(2) provides that NPDES permitting "also applies to owners or operators of any treatment works treating domestic sewage, whether or not the treatment works is otherwise required to obtain an NPDES permit,"[36] the provision "is not exclusionary, but includes additional sources that are not otherwise covered."[37] Section 122.1(b)(1) provides that point sources are subject to NPDES permitting, the argument concludes, and that is the definition that applies here. Section 122.1(b)(2), defining treatment works that are also subject to NPDES permitting, is not the basis for NPDES permitting in this case. Section 122.1(b)(2)'s exclusion of septic

---

[35] See infra note 38 and accompanying text.

[36] Emphasis added.

[37] Government's Brief at 52.

systems does not diminish § 122.1(b)(1)'s applicability to septic systems. We agree with this reading.

Section 122.1(b)(1) defines the sources requiring NPDES permits, namely point sources that discharge pollutants into U.S. waters. Section 122.1(b)(2) defines additional sources that must either obtain NPDES permits or fully meet the sewage disposal requirements of § 405 of the CWA. Section 122.1(b)(2) specifically exempts septic systems from its requirements; it incorporates the definition of treatment works from § 122.2, and this definition "does not include septic tanks or similar devices."[38] But § 122.1(b)(2) does not address the sources under § 122.1(b)(1) to which NPDES permitting applies. Rather, it implements NPDES permitting for certain sources of sewage sludge subject to special sludge disposal requirements under the CWA.

The background material to the amendments incorporating sewage sludge disposal into the NPDES permitting program confirms this reading of the statute. It states that

> the amendments direct that any permit under section 402 of the Act (NPDES permits) issued to a POTW or any other treatment works treating domestic sewage shall include the sludge technical standards, unless such requirements have been included in a permit issued under subtitle C of the Solid Waste Disposal Act, Part C of the Safe Drinking Water Act, MPRSA, or the Clean Air Act, or under State permit programs approved by the Administrator.[39]

By exempting individual septic systems from these technical sludge disposal and treatment standards, EPA prevented homeowners and other operators of individual septic systems from facing these requirements. The sewage sludge regulations aim primarily at "safe use and disposal of sewage sludge," allowing permitting that is "compatible with beneficial reuse projects [for sludge] such as

---

[38] 40 C.F.R. § 122.2.

[39] 54 F.R. 18716 (EPA 40 C.F.R. § 122, 123, 124, and 501, May 2, 1989).

agricultural land application."[40]  Once an entity physically removes sewage from an individual septic tank, the owner of that tank no longer has control over the disposal of the waste[41] and should not have to comply with sewage sludge standards.  Section 122.1(b)(2) therefore aims at the disposers, not the initial producers and dischargers, of sludge.[42]

In sum, 40 C.F.R. § 122.1 (b)(1) defines the point sources that are subject to NPDES permitting.  40 C.F.R. § 122.1(b)(2) is a separate portion of the regulation, applying sewage sludge disposal requirements to entities that might not otherwise be regulated by NPDES permits under the point source requirement.  Although septic systems are explicitly excluded from these sludge disposal requirements, Defendants have not persuaded us that septic systems are not "point sources" that discharge "pollutants" into U.S. waters under 40

---

[40] Id.

[41] See id. ("To regulate individual septic tanks (whether serving one or several households) [under the sewage sludge disposal regulations] obviously would be extremely difficult and inefficient. It would also be impractical in terms of achieving environmental results since the owners and operators of septic tanks have no effective control over the actual disposition of septage pumped from their tanks (i.e., they cannot control the entities who pump and dispose of the septage" (emphasis added)).

[42] See id. ("Part 122 contains a second part to the definition of 'treatment works treating domestic sewage.' It provides that the Regional Administrator may designate a particular facility as a 'treatment works treating domestic sewage' for the purpose of CWA section 405(f) where necessary to protect public health and the environment from poor sludge quality, use, handling or disposal practices, or to ensure compliance with 40 CFR Part 503. This enables the Regional Administrator to carry out the intent of Congress to ensure that all persons subject to the standards for sludge use and disposal (e.g., persons who handle sewage sludge but who do not generate or treat sewage sludge) operate in compliance with such standards, and that adverse effects on the environment resulting from poor sludge quality, use, handling or disposal can be minimized. The authority to designate facilities as 'treatment works treating domestic sewage' on a case-by-case basis is not required for either NPDES (Part 123) or non-NPDES (Part 501) State programs.  Under today's final rule, States are required to have a program that requires permits for POTWs and other treatment works as defined in § 501.2, but are free to develop any appropriate program to regulate other users and disposers of sewage sludge to ensure compliance with the technical standards." (emphasis added)).

C.F.R. C.F.R. § 122.1 (b)(1) and that the indictment fails to state an offense.[43] The septic systems on BHA are "containers," thus suggesting that they fall under the definition of "point source" incorporated into Section 122.1(b)(1), and septic systems hold "solid waste" and "sewage" that fit within the definition of "pollution" as defined by Section 122.2. The exemptions to § 122.1(b)(1)'s NPDES permit requirement list sewage from vessels but do not exempt individual septic systems from the permitting requirement.[44]

We have never addressed whether the Clean Water Act can require NPDES permits for septic systems, but by the language of the Act the septic systems at issue in this case are point sources that discharged pollutants into waters of the United States and required NPDES permits. Other case law provides support for this reading. The Supreme Court's plurality decision in Rapanos, in the context of § 404 of the CWA, found that,

> many courts have held that . . . upstream, intermittently flowing channels themselves constitute "point sources" under the Act. The definition of "point source" includes "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). We have held that the Act "makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'"[45]

---

[43] We recognize that we have not formerly encountered a case charging an operator of a septic system with failure to obtain an NPDES permit. This is likely because few cases have presented us with these unique circumstances, where a developer hired an engineer to approve and install septic systems directly in wetlands that are waters of the United States, thus making a system that is typically a diffuse, non-point source into a point source.

[44] See 40 C.F.R. § 122.3.

[45] 126 S.Ct. at 2227 (emphasis added) (quoting S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe, 541 U.S. 95, 105 (2004)).

The Court, in determining that intervening conduits can be point sources, cited to United States v. Ortiz[46] and Dague v. Burlington.[47] In Ortiz, the Tenth Circuit reversed an acquittal after a jury trial on a charge of "discharging pollutants from a point source (a storm drain) into waters of the United States . . . without [an NPDES] permit."[48] Defendant dumped pollutants into a toilet, and the pollutants eventually emptied through a storm drain into the Colorado River.[49] Similar to Rapanos, Dague did not involve a violation of NPDES permit requirements but addressed the definition of "point source" that is used in NPDES permitting.[50] The Second Circuit held that where pollutants ran off from a landfill into a pond and then through a railroad culvert that conveyed the pollutants into a surrounding marsh, the railroad culvert was a point source.[51] The Second Circuit followed a definition similar to the Supreme Court's in distinguishing point sources from nonpoint sources, identifying point sources as "pollutants . . . discharged from 'discernible, confined, and discrete conveyance(s)' either by gravitational or nongravitational means."[52]

---

[46] 427 F.3d 1278 (10th Cir. 2005).

[47] 935 F.2d 1343 (2d Cir. 1991).

[48] 427 F.3d at 1281.

[49] Id. at 1279-81.

[50] 33 U.S.C. § 1311, the statute addressed in Dague, uses the definition of point source from 33 U.S.C. § 1362 (see Dague, 935 F.2d at 1354) and is identical to the definition of point source for NPDES permitting contained in 40 C.F.R. § 122.2. Section 1362, like § 122.2, defines point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture."

[51] 935 F.2d at 1355.

[52] Sierra Club v. Abston Constr. Co., 620 F.2d 41, 45 (1980) (quoting 33 U.S.C. § 1362(14)).

Several district courts have found that pollutants discharged from failed septic systems into navigable waters are point sources for the purposes of the Clean Water Act. In United States v. Evans, where the "discharge alleged [was] overflow from a septic tank,"[53] the Middle District of Florida held that "the affidavits established that pollutant was being discharged from a point source into the creek."[54] In that case, some of the sewage was bypassing the septic system and flowing directly into the creek.[55] In Minnesota Center for Environmental Advocacy v. United States EPA, the court found that a "straight pipe septic system,"[56] one that disposes "untreated sewage directly via a pipe to rivers, lakes, drain tiles, or ditches," is a point source under 33 U.S.C. § 1362(14).[57] In Friends of Sakonnet v. Dutra[58] the court held, "The owners of [a] [v]illage [development] septic system are required to obtain an NPDES (national pollutant discharge elimination system) permit under 33 U.S.C. § 1342 as they are discharging pollutants into navigable waters."[59] The 33 homes had sewage lines connecting to a "large communal septic tank,"[60] and the sewage then "deposited in a leach field"[61] and was chlorinated, then sent through a pipe into the Sakkonet River. When the septic system failed, raw sewage flowed into the

---

[53] No. 3:05-cr-159(S3)-J-32MMH, 2006 U.S. Dist. LEXIS 94369 at *90, n.32 (M.D. Fla. July 14, 2006).

[54] Id. at 132.

[55] Id. at 108.

[56] No. 03-5450, 2005 U.S. Dist. LEXIS 12652 at *17 (D. Minn. June 23, 2005).

[57] Id. at 17-18.

[58] 738 F. Supp. 623 (D. R.I. 1990).

[59] Id. at 630 n.13.

[60] Id. at 627.

[61] Id.

river. The court held that the system was a "privately owned treatment works" and that "[t]here is no question . . . that the owners of the failed septic system are liable under 33 U.S.C. § 1311 [including 'effluent limitations for point sources, other than publicly owned treatment works'].["][62]

The septic systems on BHA are not a communally-used septic system or a straight-pipe system and are not privately owned treatment works. However, the evidence produced at trial was sufficient to support a finding that they were a point source and could be subject to NPDES permitting requirements under the CWA. The indictment was sufficient in charging a violation of the CWA for failure to obtain NPDES permits for the septic systems.

B

The jury instructions on point source pollution from BHA under Section 402 of the CWA were also sufficient. All Defendants object to the instructions as "misleading because the language in the instruction stated multiple times 'from a point source, to wit, a septic system,"[63] arguing that this language could have suggested that a septic system is a point source and established an essential element of the crime. The "to-wit" language arises frequently within the jury instructions because that language was part of the counts in the indictment, which the court read to the jury. The court's instructions after reading the counts did not include the phrase "to wit, a septic system" but instead required the jury to find,

> First, that the defendants knew that they were discharging or causing to be discharged pollutants; Second, from a point source; Third, that the defendants knew the physical characteristics of the property into which the pollutant was discharged that identify it as a wetland; Fourth, that the defendants knew of the facts establishing the required link between the wetland and waters of the United

---

[62] Id.

[63] Defendant Lucas's Brief at 55.

States; And fifth, that the defendants knew that they did not have a permit as required by the National Pollutant Discharge Elimination System Program, Section 402 of the Clean Water Act.[64]

These instructions did not establish that a septic system was a point source; they required the jury to find beyond a reasonable doubt that element of the crime. As the court found in overruling Thompson's attorney's objections to the instruction, "the essential element[] – Element No. 2 requires the jury to find beyond a reasonable doubt that there is a point source without telling them what it is. It's up to them to decide based on the evidence that they've heard whether these septic tanks even qualify as a point source."

Defendants also argue that "the law imposes the requirement to obtain a Section 402 NPDES permit solely upon the actual discharger or operator of a facility" and that the court's instructions misstated the law by allowing the jury to convict defendants for "causing" a discharge. The court, in overruling Defendants' objections to the instruction, found,

> I think the government's theory of the case is that they – although they may not have discharged the pollutant, they created the instrumentality through which a pollutant could have been discharged. And I'll let the jury – I'll let the jury make a determination as to whether or not that theory is sufficient to satisfy the causing of a pollutant or a causing of a discharge of a pollutant.

The court instructed the jury,

> For you to find the defendants guilty of these crimes, you must be convinced that the government has proved each of the following beyond a reasonable doubt: First, that the defendants knew that they were discharging or causing the discharge of pollutants; Second, from a point source; Third that the defendants knew the physical characteristics of the property into which a pollutant was discharged that identify it as a wetland; Fourth, that the defendants

---

[64] Emphasis added.

23

knew of the facts establishing the required link between the wetland and waters of the United States; And fifth, that the defendants knew that they did not have a permit as required by Section 404 of the Clean Water Act.

Although the court instructed the jury that it could find defendants guilty for "causing" a discharge, Lucas's attorney argued in closing,

> The EPA wants to hold Mr. Lucas responsible for septic tank problems even though he had no control over what the owners of those systems were doing to them or how they were using them. Mr. Lucas and Big Hill Acres do not operate septic systems on mobile homes in Big Hill Acres. And the evidence showed that the EPA doesn't require any kind of permit to operate a septic system. But the government is here telling you that it's a crime for Mr. Lucas not to have had a permit or, even worse, do what the Department of Health and Environmental Protection Agency encouraged him to do [i.e., take action to counter the failing septic systems].

Defendants' argument against the court's instructions turns partly on the construction of 40 C.F.R. § 122.21(b), providing, "When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit" and on whether an individual who causes a discharge can be considered an operator. Defendants point to Newton County Wildlife Ass'n v. Rogers,[65] where the court held that the Forest Service, in approving timber sales, did not need to obtain NPDES or dredge and fill permits. If any permits were required, the contractors doing the harvesting and building roads would have the responsibility of obtaining them.[66]

The Government argues that Congress amended the CWA in 1987 to broaden criminal liability under the Act and in doing so, provided that its intent

---

[65] 141 F.3d 803 (8th Cir. 1998).

[66] Id. at 810.

was to "provide penalties for dischargers or individuals who knowingly or negligently violate or cause the violation of certain of the Act's requirements."[67] The Government further argues that "defendants may . . . be held indirectly liable for the discharges as aiders and abettors under 18 U.S.C. § 2. In each of the CWA counts, defendants were charged as principals pursuant to this provision. A principal is criminally culpable for causing an intermediary to commit a criminal act even where the intermediary has no criminal intent and is innocent of the substantive crime."[68] We are persuaded by the latter argument.

In Abston Construction Co., we addressed the question of causation in the context of defining a point source of pollution. The Sierra Club brought a citizen suit against a mining company that constructed sediment basins to catch the run-off from spoil piles.[69] The basins occasionally overflowed during rainy weather, thus discharging pollutants into a creek.[70] The company argued that it was not legally responsible for the discharge because "natural" discharge in the form of rain caused the discharge from the spoil piles;[71] it argued that the discharge from the spoil piles was not a point source of pollution. We held that although the mining company had not created the gullies and ditches formed by the rainwater, which channeled the mining pollutants into the creek, the company was responsible for a point source discharge because it collected the

---

[67] Government's Brief at 79 (quoting H.R. Rep. No. 99-1004 at 136 (1986) (Conf. Rep.); H.R. Rep. No. 99-189, at 29-30 (1985) (emphasis added)).

[68] Government's Brief at 80-81.

[69] 620 F.2d at 43.

[70] Id.

[71] Id. at 44.

"rock and other materials" that eventually caused creek pollution.[72] Specifically, we held that

> [n]othing in the [Clean Water[73]] Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water.[74]

This case did not apply specifically to NPDES permits, however. Defendants' activities in constructing the septic systems fall somewhere between the standards in Newtown County Wildlife Ass'n and Abston Construction Co. Under the Newtown County Wildlife Ass'n standard, Defendants here could have been considered the "operators," as they were directly responsible for designing and certifying the septic systems that collected and discharged the waste, although a contractor handled the actual installation. The Government also provided evidence that Lucas voluntarily worked on the septic systems when owners complained that they were failing, filling them with dirt and extending the drain fields.[75] In Abston Construction Co., the mine created the waste (rocks and other mining materials) that was collected in a point source, the sediment basins; at BHA, Defendants did not create the waste collected in the septic systems.

---

[72] Id. at 45.

[73] The opinion referred to the Clean Water Act by its full name, the Federal Water Pollution Control Act.

[74] Id. at 45.

[75] Defendants provided evidence that the state and the EPA had determined that they would not prosecute installers at BHA for temporary repairs of septic problems that Defendants claimed at trial were the lot owners' responsibility. The Government presented evidence that Lucas did not follow required procedures for the repairs and attempted to repair at least one septic system on an uninhabited lot that he wished to re-sell.

We have not addressed whether individuals and corporations "causing" discharge are required to obtain NPDES permits. Several district courts have. In Evans, the Middle District of Florida upheld the constitutionality of searches challenged by the owner and operator of a labor camp. The Government had obtained search warrants to investigate, among other things, potential violations of the Clean Water Act for discharging human waste into a creek without an NPDES permit. Although the waste came from the workers in the labor camp, the Defendants may have constructed the "illegal bypass" around the septic system[76] that allowed raw human waste to flow through a PVC pipe into a creek or ditch.[77] Evans asked, of course, whether there was probable cause to believe that there was CWA jurisdiction. Friends of Sakkonet addressed a treatment works rather than a point source but also speaks to the issue of causation. There, the defendants were the corporate owners and former landowners of the land holding a large septic tank serving 33 homes. The district court granted summary judgment under the federal CWA against the "corporate owner of the land on which the failed sewage system is located" and "the sole trustee of the Trust" that owned the corporation.[78]

Defendant Lucas hired M.E. Thompson to design and certify the septic systems that discharged pollutants into navigable waters. Although Defendants' personal septic waste was not the waste that entered federal wetlands, the attempted technical distinction between the "discharge of any pollutant" and "causing" this discharge is unavailing here. The lot owners eventually used the systems, but Defendants were the cause of their operation and their unlawful discharge from the systems. At minimum, they aided and abetted the operation

---

[76] 2006 U.S. Dist. LEXIS 94369 at *108.

[77] Id. at 108-09.

[78] 738 F.Supp. at 626, 635.

of the septic systems and the resulting discharges. A jury instruction allowing conviction for "causing" the discharge of pollutants was not an abuse of discretion.

V

In addition to challenging the sufficiency of the indictment and jury instructions pertaining to NPDES permitting, all Defendants challenge the court's denial of their motion for acquittal on constitutional grounds. Counts 30-35 of the superseding indictment charged Lucas, Wrigley, and Thompson with causing the discharge of pollutants into waters of the United States without a Section 402 permit. Following the close of the Government's case, Defendants moved for acquittal on all counts. The district court initially granted acquittal for counts 30-35 but after a weekend recess reversed its ruling. The court, in reversing the acquittal, stated,

> I could be in error. And if I am in error, I should be corrected. And the only way to preserve that would be to take the matter – reserve ruling on the Rule 29 motion and allow the case to go forward to the jury with proper instructions.

The court, in other words, questioned its initial determination that there was "no evidence" on the counts. This decision did not subject Defendants to double jeopardy, and the court did not abuse its discretion in denying their acquittal motion.

Reversal of a final judgment of acquittal would place a defendant in double jeopardy. "A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed . . ."[79] But an initial ruling of acquittal followed by a change of mind before any further proceedings occur is not a final judgment. Smith v. Massachusetts confirmed that "a prosecutor can seek to persuade the court to

---

[79] United States v. Scott, 437 U.S. 82, 91 (1978).

correct its legal error [i.e., an "ill-considered acquittal ruling[ ]"] before it rules, or at least before the proceedings move forward."[80]

The district court made its initial ruling outside of the jury's presence at the end of the week and announced that the Government could appeal the ruling. The court considered the Government's arguments against the ruling during the weekend recess[81] and, before the trial progressed any further, reversed its initial ruling on the acquittal. The court's final ruling was a denial of the motion for acquittal on the CWA counts, and no double jeopardy attached after the initial ruling.

Defendants also contest counts 30-35 on the grounds that the Government's evidence for those counts did not prove CWA jurisdiction, and that the court should have granted the motion for acquittal on these counts. "So long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt, the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."[82] Where a reasonable trier of fact could find guilt beyond a reasonable doubt, "the jury [is] free to choose among the reasonable constructions of the evidence: one of which [is] consistent with [Defendant's] guilt,"[83] and the judge need not grant a motion for acquittal. We are persuaded that there was sufficient evidence to support conviction on the counts, including evidence that the wetlands on BHA were waters of the United States under the Rapanos standards, as we have discussed.

---

[80] 543 U.S. 462, 474 (2005) (citing Price v. Vincent, 538 U.S. 634, 637-38, 643-43, and n. 1 (2003)).

[81] The prosecution argued that despite the court's intent to allow an appeal of the judgment, the Government would not be able to appeal a ruling of acquittal on the counts.

[82] United States v. Loe, 262 F.3d 427, 434 (5th Cir. 2001).

[83] Id.

VI

All Defendants argue that the indictment was insufficient on the mail fraud charges and that the evidence does not support their mail fraud conviction, alleging that a breach of the warranty of habitability is necessary to show fraud for lot sales in Mississippi and that all lot buyers signed contracts making a breach of the warranty impossible.[84] Defendants also allege that no one testified that the lots were "uninhabitable" and that the Government failed to prove that septic systems backed up and caused problems because of their placement in wetlands. They conclude that a "breach of a warranty of habitability" cannot support the mail fraud conviction.

The mail fraud charges were not limited to allegations of a breach of warranty. Rather, they charged a broader scheme of fraudulent misrepresentation that induced buyers to purchase lots and use of the mails to further this scheme. The indictment charged, in relevant part,

> in advertisements to the public and in statements to individuals, represented to potential purchasers of Big Hill Acres lots that the lots were habitable and suitable for home sites when in fact they were not . . . . submitted . . . a letter certifying that the below-ground septic system . . . had been installed in compliance with Mississippi state law when in fact it was not [charge against M.E. Thompson] . . . . represented to customers that the lots they were marketing at Big Hill Acres development had or would have properly designed and correctly installed septic systems that made the lots suitable for purchase as home sites . . . entered into contracts with purchasers of Big Hill Acres to buy home sites that were not suitable for habitation requiring the purchasers to make monthly payments to the Big Hill Acres office in Lucedale, Mississippi . . . knowingly

---

[84] The contract contained a waiver provision stating, "It is understood and agreed that Buyer . . . has inspected the above described property and that the same is, and has been purchased by Buyer as a result of said inspection and not upon any representation made by Seller or its agents . . . that Buyer waives any and all claims for damages because of any representation made by any person whomsoever; and that Seller or its agent or agents shall not and are not responsible for any inducement, promise, representation, agreement, condition, or stipulation not specifically set forth herein."

caused a payment for the sale of the lot [identified in counts 2 through 18] to be delivered by the United States Postal Service to BIG HILL ACRES, INC., . . . each such mailing being a separate count . . . .

The mail fraud statute attaches criminal liability to

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing . . . .[85]

Specifically, a jury must find three elements to support a mail fraud conviction: "'(1) a scheme to defraud; (2) use of the mails to execute that scheme; and (3) the specific intent to defraud.'"[86] A misrepresentation must be material to constitute fraud under the statute,[87] meaning it "has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."[88]

We are not persuaded that the disclaimer provision of these individual sales contracts insulates Defendants from the federal charges[89] or that the fraud

---

[85] 18 U.S.C. § 1341 (emphasis added).

[86] United States v. Dotson, 407 F.3d 387, 391-92 (5th Cir. 2005) (quoting United States v. Strong, 371 F.3d 225, 227 (5th Cir. 2004)).

[87] See Neder v. United States, 527 U.S. 1, 22 (1999).

[88] United States v. Harms, 442 F.3d 367, 372 (5th Cir. 2006), cert. denied, 127 S.Ct. 2875 (2007).

[89] Defendants do not cite to any case law for this proposition.

alleged and shown in this case was limited to a violation of that narrow warranty.

We have not addressed the question of whether a working septic system is required for the implied warranty of habitability that arises from a contract of the sale of a house and land under Mississippi law. Mississippi courts have held that the warranty covers mobile homes and septic systems.[90] We have determined in an Alabama case that a realtor's misrepresentation that a vacant lot's soil was suitable for a septic tank[91] may have constituted intentional and negligent misrepresentation and a breach of implied warranty, remanding to the district court to consider the issue.[92]

The contracts for the lots purportedly waived the liability of Defendants and their agents for any representations made outside of the written contract, including "inducements." A broad contract waiver cannot exempt Defendants from federal mail fraud conviction in this case. "The Supreme Court has repeatedly noted that misrepresentation cannot be justified by incorrectness of the position of the party to whom the misrepresentation is made."[93] Although residents inspected the lots and verified this inspection in the contract,

---

[90] See, e.g., Moorman v. Tower Management Co., 451 F.Supp.2d 846, 851 (S.D. Miss. 2006) (quoting Staley v. Bouril, 718 A.2d 283, 284-85 (1998)) (finding that the warranty of habitability applies to mobile home lots and citing the Staley case, which "recognized that 'in leasing improved lots in a mobile home park,' tenants 'bargain for a similar bundle of goods and services,' including, for example, 'potable water, adequate septic service, and proper electrical connections,' all of which are 'essential components of a habitable residence'").

[91] See Mann v. Adams Realty Co., Inc., 556 F.2d 288, 291 (5th Cir. 1977) (The realtor had stated that "[e]verything [was] fine" concerning the septic system).

[92] Id. at 297.

[93] Dotson, 407 F.3d at 393-94 (citing United States v. Mandujano, 425 U.S. 564 (1976) ("sanctions for false statements or perjury allowed even when inquiry was unconstitutional") and Dennis v. United States, 384 U.S. 855 (1966) ("'It is no defense to a charge based upon [conspiracy to circumvent a law through deceit] that the statutory scheme sought to be evaded is somehow defective.'")).

Defendants made misrepresentations that directly contradicted inspecting buyers' observations. Wrigley misrepresented the dryness of the site, for example, when buyers noticed wetlands and wetlands vegetation and questioned her about the wetlands.

The Government presented evidence that Defendants, despite warnings from agencies that they were installing septic systems in saturated soils, advertised the lots as "high and dry" and, when asked by owners if there were wetlands on the property, responded that there were none. "[T]he mail fraud statute does not require a completed fraud, just that the defendant has 'devised or intend[ed] to devise' a scheme to defraud,"[94] but the Government presented evidence of a completed fraud, indicating that the lots were not in fact dry, as Defendants had advertised, and that residents encountered sewage problems on their wet lots.[95] At least one witness also testified that Wrigley or Lucas added language to her contract after she signed it; the language stated that she had been notified about potential wetlands on her property, while the owner testified that Defendants had not informed her of wetlands or shown her any wetlands maps when she was purchasing the property. Other witnesses testified that their land was wet and that their septic systems backed up. A witness who had asked Wrigley whether there were any wetlands on the property testified that it "would have made a huge difference" in her decision to buy the property if Wrigley had informed her that it contained wetlands. Although Defendants presented some evidence that the septic systems failed because lot owners had

---

[94] United States v. Ratcliff, 488 F.3d 639, 645 n.7 (5th Cir. 2007).

[95] Patrick Brossett, Sr. testified that he "had a problem with it [the septic] flooding up on the ground all the time. Every time it rains, it comes up." Winford Patterson testified that "within the first month" his septic system "filled up. Commodes wouldn't flush." Sewer "[w]ater was coming up into the bathtubs and the sinks and the showers." He testified that he had to drain waste from the system out of his yard and "into the property ditch." Patricia Griswold testified that sewage "was still backing up inside the trailer even after the septic tank was pumped."

misused their septic systems, other lot owners testified that they only disposed of proper waste in their systems, yet the systems still failed.[96]  Based on this evidence, "a reasonable trier of fact could conclude that the Government proved beyond a reasonable doubt"[97] that Defendants made material misrepresentations in selling the lots and that the septic systems failed because they were placed in wetlands.

The Government also presented evidence that Defendants used the mail to accomplish fraudulent sales: they caused lot owners to send payments through the mail to the BHA, Inc. office and sent receipts through the mail for these payments.[98]  We are persuaded that the mailings were sufficiently connected to the fraudulent misrepresentations.  "One 'causes' an article to be delivered by mail if he acts with the knowledge that use of the mail will follow in the ordinary course or if use of the mail is reasonably foreseeable . . . ."[99]

After purchasing a lot based on fraudulent misrepresentations, prospective lot owners committed themselves to years of installment payments to be made through the mail.  Although many owners made payments after the EPA had informed them that their lots were on wetlands, these payments connected directly back to contracts that they signed prior to agency warnings.

---

[96] Pansy Maddox, district environmental supervisor for MDH, also testified that "[m]ost of the systems were failing because fled drains had been placed in soils that were too wet and do not drain adequately to absorb the wastewater."

[97] Harms, 442 F.3d at 374.

[98] Defendants allege that "proof of mailing was lacking for Counts 10 and 16."  Count 10 involved lot GG-4.  Patricia Griswold, the former owner of lot GG-4, testified that she made a payment in the mail for that lot and verified that a receipt for that payment (Government's Exhibit 50(ii)) came through the mail.  Count 16 involved lot YY-1.  The owner "involved in purchasing YY-1 and YY-2" testified that "[w]e paid cash and sometimes by check" for the lot payments.  "We mailed them."  He also verified that Government's Exhibit 79(a) contained "envelopes that Mr. Lucas had given us to send our money in to them."

[99] United States v. Blankenship, 746 F.2d 233, 240 (5th Cir. 1984).

Defendants challenge the court's instructions on mail fraud, arguing that the court abused its discretion by failing to instruct on materiality. For jury instructions, "the omission of an element is subject to harmless-error analysis."[100] Although the district court erred in stating that the Fifth Circuit Pattern Jury Instructions for mail fraud do not mention materiality,[101] the district court's instructions defined false representations as constituting "a half truth, or effectively conceal[ing] a material fact, provided it is made with the intent to defraud."[102] But this does not end our inquiry. The inclusion of the word "or" between "half truth" and "conceals a material fact" could have suggested to the jury that a false representation could be defined as a half truth that concealed a non-material fact. The court's instruction, under either definition of false representation – one that is a "half truth" or "conceals a material fact" – correctly required the jury to find, for a mail fraud conviction, that defendants "knowingly created a scheme to defraud. That is, obtain money by inducing individuals to lease, rent or purchase lots or subdivided real property in [BHA] under representations that were false."[103]

The court's instructions included a requirement of materiality. As indicated above, "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."[104] By instructing the jury that the

---

[100] Neder, 527 U.S. at 10.

[101] The pattern jury instructions require, inter alia, "That the scheme to defraud employed false material representations." 2001 Fifth Circuit Criminal Jury Instructions.

[102] Emphasis added.

[103] Emphasis added.

[104] Neder, 527 U.S. at 16 (internal quotations and citations omitted, emphasis added).

misrepresentations must have induced individuals to lease the property to constitute fraud, the court required that the jury establish materiality.

## VII

Moving from mail fraud to conspiracy, M.E. Thompson – the engineer who designed and certified the septic systems – and Wrigley and Lucas,[105] contest the sufficiency of the conspiracy charge in the indictment and the sufficiency of the evidence proving conspiracy. They also argue that because the conspiracy convictions "are contingent upon the underlying charges" of violation of the CWA and mail fraud, there is insufficient evidence to support the conspiracy charges. Because we have found sufficient evidence to support the underlying charges, we need not address their final argument.

We review "the sufficiency of an indictment de novo, taking the indictment's allegations as true."[106] To prove a conspiracy under § 371, the evidence must prove and the indictment must allege "(1) an agreement between the defendant and a co-conspirator to violate a law of the United States; (2) an overt act by one conspirator in furtherance of the conspiracy; and (3) the specific intent to further an unlawful objective of the conspiracy."[107] The agreement "must be arrived at knowingly," and "'[m]ere association with those involved in a criminal venture is insufficient to prove participation in a conspiracy.'"[108] The Government may prove an agreement using "circumstantial evidence," and "in a conspiracy case: an agreement may be inferred from concert of action,

---

[105] Lucas, BHA, Inc., and Consolidated Investments, Inc. briefed the conspiracy issues. Wrigley and Thompson adopted the arguments from that brief. Thompson additionally argued that the evidence did not support his conviction for conspiracy.

[106] United States v. Ratcliff, 488 F.3d 639, 643 (5th Cir. 2007).

[107] United States v. Bieganowski, 313 F.3d 264 , 276 (5th Cir. 2002).

[108] Id. at 277 (quoting United States v. Ballard, 663 F.2d 534, 543 (5th Cir. 1981)).

voluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances."[109]

With respect to the sufficiency of the indictment, Defendants only challenge the unlawful objective prong, arguing that the object of the conspiracy – the sale of wetlands – was not illegal. The indictment sufficiently alleged unlawful objectives and placed Defendants on notice of the offenses charged. The unlawful objectives charged included, inter alia,

> Use of the United States Mail in furtherance of a scheme to defraud by inducing individuals to lease, rent, and purchase residential lots in the Big Hill Acres development . . . by making material representations they [Defendants] knew to be false that the lots were suitable for habitation when they were not, in violation of Title 18, United States Code, Section 1341 * * * By installing septic systems in water-saturated soils and wetlands, knowingly causing pollutants, including human waste, to be discharged from point sources, into waters of the United States, specifically, wetlands located in Vancleave, Mississippi, without a permit . . . in violation of Title 33, United States Code, Section 1319(c)(2)(A).

Defendants also challenge the sufficiency of the evidence for the conspiracy conviction, arguing that there was insufficient evidence to show an agreement between Thompson and any one of the other Defendants, or that any of the Defendants intended to violate the mail fraud statute or the CWA. When proving conspiracy,

> "[a]n express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." Because secrecy is the norm, each element may be established by circumstantial evidence.[110]

---

[109] Id. (internal quotations omitted).

[110] United States v. Farias, 469 F.3d 393, 398 (5th Cir.) (quoting United States v. Infante, 404 F.3d 376, 385 (5th Cir. 2005)), cert. denied, 127 S.Ct. 1502 (2007).

The circumstantial evidence showed that Thompson agreed to the conspiracy, participated in overt acts in furtherance of the conspiracy, and that he had knowledge of the unlawful objectives of the conspiracy. The evidence also was sufficient to support a finding that Defendants intended to commit mail fraud or to violate the CWA. The Government presented evidence that Thompson attended meetings about the septic system designs with MDH and a "representative" of Lucas.[111] The MDH informed Thompson in letters that many of the septic systems he had certified were illegal and that he had certified septic systems on sites where the MDH had rejected the installation of septic systems. The MDH sent a letter to Lucas informing him that the MDH had rescinded many of its former recommendations of septic systems, and an MDH employee met with Wrigley to explain why the MDH could not recommend underground septic systems for the property. After MDH brought legal action against Thompson for illegally approving wastewater disposal systems at a non-BHA site, Wrigley told the MDH to stop interfering with Thompson's certifications.[112] The MDH also sent letters to Thompson warning him that he was illegally installing systems. The Government presented evidence that Thompson ignored the MDH's warnings and certified systems to allow lot sales to move forward.[113] The Government also presented evidence that Thompson did not inspect many

---

[111] Maddox testified that Mr. Thompson requested a meeting with her "to discuss the regulations" regarding septic systems in saturated soils and that Tommy Brodnax attended the meeting and "said he was there on behalf of Mr. Lucas and his development in Vancleave." She testified that "a couple weeks later, Tommy Brodnax and M.E. Thompson requested another meeting" with her.

[112] Jim Weston, branch director of the division of on site wastewater at MDH, testified that Wrigley "picked [him] up, and she [rode] him around Ocean Springs" and told him that "she felt that Mr. Thompson was doing a very good job for them out there. As far as she knew, that he knew more about it than we did. And that we should be ashamed of ourselves for having him arrested."

[113] Defendants presented evidence that Thomspon disagreed with the MDH's standards for interpreting soil charts and identifying saturated soils, arguing that his alleged non-compliance was a result of this disagreement.

of the systems that he certified and infrequently supervised installation. A reasonable jury could have determined beyond a reasonable doubt that Thompson, Lucas, and Wrigley conspired to profit from the sale of lots that were not habitable and to violate the CWA.

Thompson, Lucas, and Wrigley also challenge the court's jury instructions on conspiracy, alleging that the court erred in refusing to instruct the jury on unanimity and that the Government also requested a unanimity instruction, which the court failed to give. The district court viewed the conspiracy claim as a single conspiracy to commit several offenses, instructing the jury to find

> that the defendant and at least one other person made an agreement to commit at least one of the offenses charged in the indictment. That is, the crime of mail fraud or to knowingly violate Section 404 of the Clean Water Act or to knowingly violate Section 402 of the Clean Water Act as charged in the indictment.

Defendants allege that these instructions created a "genuine risk that the jury [would be confused] or that a conviction [might] occur as the result of different jurors concluding that a defendant committed different acts" and that the court should have instructed on unanimity for this charge. The district court did not abuse its discretion in refusing to do so. The instructions did not risk confusing the jury, and they reasonably instructed the jury that it must find that Defendants agreed[114] to commit "at least one of the offenses" to convict for

---

[114] See United States v. Dillman, 15 F.3d 384, 391-92 (5th Cir. 1994) (citations omitted) ("The appellants' argument fails because it is based on a fundamental misunderstanding of the crux of a conspiracy charge under 18 U.S.C. § 371: The defendant's voluntary agreement with another or others to commit an offense against or to defraud the United States. It does not matter that a single conspiracy was comprised of several objects to which the defendant did not specifically agree to accomplish, if those acts were reasonably foreseeable. Once the defendant had joined the agreement, the acts of the other conspirators became his acts irrespective of whether he physically participated in those particular acts or expressly agreed to the various specific objectives that constituted the respective stages of the overarching conspiracy. When twelve jurors believe beyond a reasonable doubt that the defendant under

39

conspiracy, suggesting that the jurors had to concur on the specific offense – or the several offenses – that Defendants agreed to commit.

Finally, Defendants argue that the "District Court erred in failing to instruct the jury that if the objective of the conspiracy was legal, Defendants could not be convicted of conspiracy." Although Defendants' proffered instruction was an accurate statement of the law, the court's instructions substantially covered the alternative language. They required that, in order to find conspiracy, the jury must find that Defendants agreed to commit the "crime of mail fraud or to knowingly violate Section 404 of the Clean Water Act or to knowingly violate Section 402 of the Clean Water Act as charged in the indictment," thus indicating that the jury must find that Defendants agreed to do something illegal.

## VIII

All of the Defendants contest several evidentiary rulings of the court.[115] At trial, the Government presented Phillip Johnson, a lot owner and worker at BHA, as a witness. The Government provided Defendants with "The Statements of Phillip Johnson" prior to trial but substantially redacted the statements by cutting out large paragraphs and repasting the material. The redacted portions included allegations that Robert Lucas had bribed local officials to further his business on BHA. Defendants were unaware of the redacted bribery allegations until Johnson mentioned them in direct examination. For the first time at oral argument, the Government claimed that it had not planned to elicit the bribery testimony and that Johnson's statements came as a surprise.

---

consideration agreed to achieve an ultimate criminal purpose against the United States, all jurors need not agree on which particular offenses that defendant intended personally to commit as long as there is but one conspiracy that encompasses the particular offenses charged.").

[115] Lucas, BHA, Inc., Consolidated Investments, Inc., and Thompson adopted Wrigley's evidentiary arguments.

Regardless of whether or not the Government anticipated that Johnson would testify about bribery, its behavior was wrong. By redacting the statements in a non-obvious manner and failing to reveal material that would arise at trial, the Government shortened Defendants' time to prepare an adequate defense.

When improper evidence is introduced to the jury but a defendant's subsequent motion for mistrial is denied, we review the denial for abuse of discretion[116] and, if we find error, we apply harmless error review.[117] Further,

> New trial is required only when, after a review of the entire record, it appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict. We give great weight to the trial court's assessment of the prejudicial effect of the evidence, and prejudice may be rendered harmless by a curative instruction.[118]

The FBI had interviewed Johnson and had prepared a summary of the interviews. The Government provided a redacted version of this summary to defendants before trial, as required by Rule 16 for organizational defendants.[119] The redacted version of the FBI summary omitted the following language:

> While employed at BHA he [Johnson] knew several other men who worked for LUCAS [followed by the names of employees]. He believes that most of these employees are still around. DANNY ANDERSON moved to Newberry, South Carolina.

---

[116] United States v. Valles, 484 F.3d 745, 756 (5th Cir. 2007) (citing United States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997), cert. denied, 127 S. Ct. 3025 (2007), and petition for cert. filed (Jul. 6, 2007) (No. 07-8373), and cert. denied, 128 S. Ct. 238 (2007).

[117] See, e.g., Dorsey v. Quarterman, 494 F.3d 527, 531 (5th Cir. 2007) (jurors saw non-redacted version of a redacted transcript that had been introduced at trial; defendant moved for mistrial; court denied motion; we reviewed for harmless error and found that any error was harmless), petition for cert. filed (Oct. 27, 2007) (No. 07-7371).

[118] Valles, 484 F.3d at 756.

[119] FED. R. CRIM. P. 16(a)(1)(C).

> JOHNSON heard rumors from other employees that LUCAS paid off county officials in order to develop land he was not supposed to, build roads in an inferior manner, and get approval for septic tanks in areas where they would clearly not function correctly. JOHNSON always assumed that these were just rumors and that LUCAS was doing things correctly.
>
> However, one day he saw something that troubled him. Around that spring of 1998 he was repairing a piece of equipment on the job site. LUCAS pulled up in his car, then two males pulled up in a Ford Crown Victoria with county tags displayed on it. LUCAS handed each of the men a brown envelope. They stood at the back of the car and spoke. Then TOMMY BROADNAX [sic], a county supervisor pulled up. BROADNAX [sic] also received a brown envelope from Lucas . . . All four men then got in the county car and drove off. They were only gone for a few minutes. When they returned BROADNAX [sic] and LUCAS got out and got in LUCAS' car and drove towards the BHA office. The two men got in the county car and drove away.
>
> BROADNAX [sic] would frequently come out to the area and ride around with LUCAS. Other employees told him that BROADNAX leased a dump truck to BHA. The dump truck was very seldom used but, LUCAS paid for it on a monthly bases [sic] whether or not it was utilized.

Johnson, in response to a Government question about a meeting that Johnson had with Brodnax, testified that Lucas "pulled out a couple of envelopes and gave one to Tommy," and that there was "some greenback" in the envelope. This testimony was a surprise to both the court and Defendants. This surprise introduction of the bribery evidence was unfair but did not rise to a deprivation of Defendants' due process rights.

After Johnson testified about bribery, the court changed its prior ruling that Defendants could not introduce Johnson's criminal background, allowing them to extensively cross-examine him about his prior convictions and arrests.

The court also gave curative instructions and reminded the jury about the testimony on Johnson's prior convictions, stating,

> You have been told that the witness Phillip Johnson was previously convicted of several felony offenses. A conviction is a factor you may consider in deciding whether to believe that witness, but it does not necessarily destroy the witness' credibility. It has been brought to your attention only because you may wish to consider it when you decide whether your believe the witness' testimony. * * * You are here to decide whether the government has proved beyond a reasonable doubt that the defendants are guilty of the crimes charged. The defendants are not on trial for any other act, conduct or offense not alleged in the indictment.

Although Defendants argue that despite these measures, the bribery evidence tainted the entire case and "moved the direction of the trial from a mail fraud, wetlands, habitability, Clean Water Act case into a public bribery case," the evidence from the record does not suggest that the case was tainted to this degree or that it led the jury to settle upon a verdict that it would not have otherwise reached. The Government presented evidence of Defendants' continued and knowing violations of the law, despite several agencies' orders to stop. The evidence in the case did not focus unduly on bribery but rather on the hydrology of the area, the problems that residents faced as a result of septic systems installed in wet areas, and Defendants' methods for advertising, selling, and receiving payments for the lots. The Government did not mention bribery in its closing argument; its only discussion of Phillip Johnson referred to his warnings to Lucas that the land was wet, his complaints about the failed septic system on his lot, and his road construction work as an employee for Lucas.

Defendants also argue that the Government, in providing Johnson's redacted statements to Defendants prior to trial, failed to properly disclose Rule 16(A)(1)(c) evidence of statements by an organization's representative; failed to comply with the court's discovery order in violation of Rule 26; violated the

Jencks Act; and introduced improper 404(b) character evidence of "bad acts." The Government did not violate the Jencks Act because it provided an unredacted version of the statements after Johnson testified. Even assuming that the Government violated the court's discovery order and Rule 16(A)(1)(c) by failing to provide a full, unredacted version of Johnson's statements prior to trial, we are not persuaded that the introduction of the testimony and the Government's failure to disclose the nature of that testimony in advance rose to the level of reversible error.[120]

The day after Johnson had mentioned the bribery incident, the court advised Johnson to "make a conscious effort to try to limit [his] responses to the questions so that [he would be] responsive to the question and [not] give us more . . . more of a colorful comments [sic] and colorful testimony than is really necessary for this jury to resolve the issues." The court also allowed the Defendants to extensively cross examine Johnson and gave the jury cautionary instructions, as discussed above.

Finally, the district court did not abuse its discretion in refusing to strike Johnson's testimony and ruling that Johnson's testimony was evidence of overt acts and not Rule 404(b) character evidence, finding,

> The government's theory of the conspiracy from the beginning has included the allegation that Mr. Brodnax was at a minimum helpful in obtaining favorable zoning decisions and resolutions from the board of supervisors, exerting influence upon the health department in an overall effort to assist Mr. Lucas.

We have held that "all the government need do [to show that Rule 404(b) does not apply] is suggest a logical hypothesis of the relevance of the evidence for a

---

[120] See United States v. Ramirez, 174 F.3d 584, 587 (5th Cir. 1999) ("Even when a [Jencks Act] violation is found, the failure to produce prior statements is subject to a harmless error analysis."); United States v. Gonzalez, 661 F.2d 488, 494 (5th Cir. 1981) ("Assuming that th[e] failure to disclose [under 16(a)(1)(C)] was the government's error, it is not cause to reverse unless prejudicial to the substantial rights of the accused.").

purpose other than to demonstrate [the defendant's] propensity to act in a particular manner."[121]  In its opening arguments, the Government stated:

> [T]he Jackson County board of supervisors granted Mr. Lucas variance after variance, freeing him from any platting requirement. . . . These variances from the Jackson County board of supervisors were an additional benefit to Mr. Lucas and Ms. Wrigley. . . . The variances freed them from the scrutiny of the planning department.

The Government then introduced evidence of  the unusual number of variances granted to Lucas, including the testimony of Johnson, who worked for Lucas and witnessed his interactions with the board.

Defendant Thompson argues that the court abused its discretion in denying his motion to sever following the introduction of Johnson's surprise testimony.  We review a district court's denial of a motion for severance for an abuse of discretion[122] and reverse only if "there is clear prejudice to the defendant"[123] as a result of the denial.  Defendants argue that "Thompson suffered extreme prejudice from the joint trial with Robert Lucas . . . [because] a new but uncharged crime c[a]me before the jury (bribery) which he had no opportunity to defend since he was not aware of any such purported act and the Government concealed the prejudicial testimony in discovery."  They further argue, "The prejudice suffered by Defendant Thompson is patently compelling and the court could do nothing to mitigate same, as it was impossible to mitigate the effect on the jury or give the defendant sufficient time to prepare a defense . . ."

---

[121]  United States v. Kraut, 66 F.3d 1420, 1431 (5th Cir. 1995).

[122]  United States v. Hickerson, 489 F.3d 742, 746 (5th Cir. 2007) (citing United States v. McCarter, 316 F.3d 536, 538 (5th Cir. 2002), cert. denied, 128 S. Ct. 521 (2007).

[123]  Id. (quoting United States v. Holloway, 1 F.3d 307, 310 (5th Cir. 1993)).

Thompson cites the court's remarks regarding its surprise over the introduction of Johnson's bribery evidence.  A court's surprise over the introduction of evidence does not demonstrate clear prejudice, and Thompson fails to indicate how he was otherwise prejudiced.

Defendants also sought leave to depose a witness, Bobby Strickland, and present his deposition at trial to counter the evidence introduced by Johnson. The district court denied the motion.  Mr. Strickland was unable to testify at trial due to "distance, surgery, and death in his family."  Defendants allege that Strickland would have countered Johnson's claims about his relationship with Strickland.

District courts have "broad discretion" to grant or refuse a Rule 15(a) motion, and they "should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute 'exceptional circumstances.'"[124] "The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled."[125] Such extraordinary circumstances include, for example, situations where a potential deponent would not likely be able to return to the United States.[126] Even if extraordinary circumstances are present, the proposed deposition must be "material,"[127] and we subject any error caused by denial of a motion for deposition to harmless error review.[128]  Where "even assuming the greatest benefit to the defendants from [the proposed deponent's testimony, that

---

[124] Dillman, 15 F.3d at 389 (quoting United States v. Bello, 532 F.2d 422, 423 (5th Cir. 1976)).

[125] Id.

[126] Id.

[127] Id.

[128] Id.

testimony still could not have exculpated [the defendant],"[129] we find harmless error.

Although Strickland's testimony would have been "material" in the sense that it may have discredited some of Johnson's claims, the circumstances of "distance, surgery, and death in his family" are not extraordinary. Even if they were, Strickland's testimony would not have necessarily helped to exculpate Defendants from their direct charges, as bribery was not included in the charges but was evidence relevant to the conspiracy, of which there was substantial evidence unrelated to bribery, as we have described.

Finally, Defendants argue that the Government committed many unforgivable errors throughout the trial by making multiple speaking objections, mentioning in front of the jury that Defendants had filed a motion to dismiss, suggesting that Defendants had the burden of proof,[130] alluding to the fact that Thompson had not testified,[131] and asking "prejudicial questions" with "no good faith basis."[132] The court instructed the jury that Defendants had no burden of proof and that statements by lawyers are not evidence, stating,

> [t]he law does not require a defendant to prove his innocence or to produce any evidence at all and no inference whatever may be drawn from the election of a defendant not to testify. The government has the burden of proving each of the defendants guilty beyond a reasonable doubt; and, if it fails to do so, you must acquit

---

[129] Id.

[130] The prosecution asked one of Defendants' witnesses on cross, "And you're asking the jury to rely on this beyond a reasonable doubt, and there are no data points here at all on it, right?"

[131] The prosecution stated, in referring to defense counsel's cross examination, "Your honor, he's just simply testifying. If they want to put Mr. Thompson on to say what happened. But he's testifying. I object to it."

[132] Claiming, for example, that "the Government elicited testimony about the drinking water that the Government knew to be baseless, but which was highly prejudicial to Appellants."

47

that defendant. * * * Remember that any statements, objections or arguments made by the lawyers are not evidence in the case.

After the Government alluded to Mr. Thompson's decision not to testify and Mr. Thompson's attorney made a motion for mistrial, the court also gave a cautionary instruction, stating,

> the government's attorney made a comment during an objection which may have been taken by you as an indication that Mr. M.E. Thompson would or should testify in this case. First, I want to remind you the defendants are presumed innocent until proven guilty. The burden of proof is on the government until the very end of the case. The defendants have no burden to prove their innocence or to present any evidence or to testify. Since the defendants have the right to remain silent, the law prohibits you in arriving at your verdict from considering that the defendants may not have testified. I specifically instruct you that Mr. Thompson has absolutely no duty to testify. And you are not to hold it against him or to consider that in any way as to whether or not he is guilty or not guilty of the crimes that are charged against him in the indictment. He has an absolute right under the Constitution of the United States not to testify. And that is not to be held against him by the jury. And I want you to keep that in mind at all times. I don't know whether Mr. Thompson will testify or not. However, any remarks counsel for the government may have made that might lead you to expect Mr. Thompson to testify should be put out of your minds entirely.

Defendants understandably take issue with the tactics of the Government, but none of their examples suggest that the tactics were so out of line that we must find that the district court abused its discretion in refusing to grant a mistrial. That does not mean that we approve of this want of professionalism.

IX

The court, following the guidelines, sentenced Lucas to 108 months' imprisonment and three years' supervised release and fined him $15,000. It sentenced both Wrigley and Thompson to 87-month sentences with three years' supervised release and assessed $15,000 in fines against each of them. It fined

BHA, Inc. $4.8 million and Consolidated Investments $500,000, and assessed $1,407,400 in restitution against each Defendant.[133] Defendants argue that the restitution is based on an erroneous calculation of loss and the number of victims. Defendants also contest the court's refusal to grant downward departures for acceptance of responsibility.

"'Although the determination of loss is a factual finding reviewed for clear error, the court's choice of the method by which losses are determined involves an application of the sentencing guidelines, which is reviewed de novo.'"[134] Defendants argue that the district court erred in calculating a loss range between $1 and 2.5 million based on the eighteen lots in the mail fraud counts and in calculating the number of victims. They assert that even if the loss figure were correct, the court should have authorized a lower loss figure because "the offense level determined under this guideline substantially overstated the seriousness of the offense." Defendants also argue that the court erred in identifying 67 victims when calculating loss, as only 21 residents and former residents testified, and MDH evaluations indicated that 25 septic systems malfunctioned.

The court properly used the sales price of the lots to calculate the amount of money that Defendants intended to receive from the fraud – i.e., the loss to the victims of the fraud. This is an acceptable measure under United States v. Pennell.[135] The court also correctly determined the number of victims by

---

[133] The court also sentenced BHA, Inc. and Consolidated Investments to 5 years' probation and made special assessments of $7,600 and $400 against BHA and Consolidated Investments, respectively.

[134] Harms, 442 F.3d at 379 (quoting United States v. Deavours, 219 F.3d 400, 402 (5th Cir. 2000)).

[135] 409 F.3d 240, 244 (5th Cir. 2005).

identifying the individuals included in the indictment.[136] The number of victims should not be limited to those who testified at trial or to the MDH evaluations that showed that 25 septic systems malfunctioned, as Defendants argue. Defendants were convicted for a fraudulent scheme that affected many lot buyers, not just those that Mississippi determined to have been affected by septic system problems.

Finally, Defendants argue that the court should have granted a downward departure from the sentencing guidelines because they accepted responsibility for their acts, arguing that Lucas did not challenge the underlying facts presented by the Government but rather disputed the constitutionality of the CWA. We review a court's interpretation of the guidelines de novo and its findings of fact in the sentencing hearing for clear error.[137] We "lack[] jurisdiction to review a downward-departure denial unless . . . the district court held a mistaken belief that the Guidelines do not give it the authority to depart."[138] Appellants produce no evidence that the court was unaware of its authority.

AFFIRMED.

---

[136] United States v. Cothran, 302 F.3d 279, 290 (5th Cir. 2002) ("under our precedent, the district court could award restitution to all of the victims of the broader scheme").

[137] United States v. Austin, 479 F.3d 363, 367 (5th Cir. 2007).

[138] United States v. Sam, 467 F.3d 857, 861 (5th Cir. 2006).