**PRECON DEVELOPMENT COR-PORATION, INC., A Virginia Corporation, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.**

**Action No. 2:08cv447.**

United States District Court, E.D. Virginia, Norfolk Division.

Sept. 4, 2009.

Douglas Eugene Kahle, Mark Randolf Baumgartner, Pender & Coward PC, Virginia Beach, VA, for Plaintiff.

Austin David Saylor, Kent Edmund Hanson, U.S. Department of Justice, Washington, DC, Craig Paul Wittman, United States Attorney's Office, Norfolk, VA, for Defendant.

## FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on the Motion for Summary Judgment, filed

by the plaintiff on March 6, 2009, and the defendant's Cross Motion for Summary Judgment filed on April 17, 2009. The matter was referred to a United States Magistrate Judge by order of June 3, 2009, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), to conduct hearings, including evidentiary hearings, if necessary, and to submit to the undersigned proposed findings of fact, if applicable, and recommendations for the disposition of the motions.

The United States Magistrate Judge's Report and Recommendation was filed on August 19, 2009. (Docket # 54). The magistrate judge recommended that the plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted. By copy of the Report and Recommendation, the parties were advised of their right to file written objections thereto. On September 2, 2009, the court received the plaintiff's objections to the Magistrate Judge's Report and Recommendation, in which the plaintiff also requests a further hearing in this matter. (Docket # 55).

The magistrate judge conducted a hearing on August 4, 2009, on the cross-motions for summary judgment, and the transcript of that proceeding was filed on August 7, 2009. (Docket # 53). The magistrate judge thoroughly heard the issues raised by both parties, and issued a comprehensive Report and Recommendation. Further hearing in this matter will not aid in the decisional process.

The court, having examined the objections by the plaintiff to the Report and Recommendation and having made *de novo* findings with respect thereto, does hereby adopt and approve in full the findings and recommendations set forth in the Report and Recommendation of the United States Magistrate Judge filed August 19, 2009. Accordingly, the plaintiff's motion for summary judgment is hereby **DENIED**; the defendant's motion for summary judgment is hereby **GRANTED**. The Clerk shall enter judgment for the defendant and the case is **DISMISSED** from the docket.

The Clerk shall forward a copy of this Final Order to counsel for the parties.

It is SO **ORDERED**.

## REPORT AND RECOMMENDATION

TOMMY E. MILLER, United States Magistrate Judge.

This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered June 3, 2009 [Doc. 44], for a Report and Recommendation on the parties' cross motions for summary judgment [Docs. 39, 41].

### I. UNDISPUTED FACTS[1]

1. Precon Development Corporation, Inc. ("Precon" or "Plaintiff") is the developer of a 658 acre planned unit project ("Edinburgh") in Chesapeake, Virginia.

2. Precon seeks to develop 10 residential building lots (the "Site") in Edinburgh. Within the Site, 4.8 acres of wetlands ("Site Wetlands") would potentially be impacted by the development.

---

**1.** On March 5, 2009, the Court ordered that neither party was bound by Local Civil Rule 56(B) to file individual statements of material facts. [Doc. 38.] As a result, the Undersigned has drafted a list of undisputed facts based on all the relevant briefs, in their entirety, and oral argument.

3. The Site Wetlands are not marsh land, but rather, are areas of poorly draining soil, situated about 20 feet above sea level, which fall within the regulatory definition of wetlands. (R. at 0108_1_011.) [2] The Site Wetlands are part of a larger 166 acres of wetlands ("Western Wetlands") situated on the western side of Edinburgh. (R. at 01 57_1_003.)

4. A 2,500 foot long ditch ("the Ditch") runs adjacent to the Site Wetlands, along the western boundary of Edinburgh. (R. at 0157_1_003; 0157_2_013.) A continuous berm separates the Ditch and the Site Wetlands, cutting off any direct surface connection. (R. at 0160_00_005.)

5. The Ditch flows seasonally, primarily from rainfall. *Id.* The Ditch runs north from the southwestern corner of Edinburgh until it intersects with Saint Brides Ditch approximately 900 feet north of the Site Wetlands. (R. at 0157_2_006; 0157_2_013.)

6. Saint Brides Ditch, in part, runs along the border of the remaining Western Wetlands. A minimum of 3 breaks are present in the berm along this border, and water from the Western Wetlands flows into Saint Brides Ditch through these breaks. (R. at 0160_00_005.) Also, subsurface flow exists; specifically, the Western Wetlands slowly release groundwater into Saint Brides Ditch. *Id.*

7. Saint Brides Ditch is a perennial flow.[3] (R. at 0160_00_003.)

8. Saint Brides Ditch originates north of Edinburgh and flows south, eventually running parallel to Edinburgh's western boundary. (R. at 0157_1_003.) Saint Brides Ditch then flows west, away from Edinburgh, for 2,250 feet, then south for 5,500 feet, then southeast for 2,235 feet where it crosses under Saint Brides Road, then another 4,088 feet where it joins another tributary of the same order, then south for 11,053 feet where it joins Hickory Ditch, then on another 8,300 feet where the combined tributary drains into the Northwest River. (R. at 0157_2_009.)

9. The Northwest River is a traditional navigable water. (R. at 0157_1_003.)

## II. PROCEDURAL HISTORY

In 2001, the United States Army Corps of Engineers ("Corps" or "Defendant") filed suit against the previous developer of Edinburgh for alleged violations of the Clean Water Act ("CWA"). *United States v. RGM Corp.*, 222 F.Supp.2d 780 (E.D.Va. 2002). The Corps alleged the owner had discharged fill material into navigable waters without the requisite permits, but District Judge Morgan held that the property was not subject to jurisdiction under the CWA. *Id.* at 788. While the Corps' appeal was pending, however, the Fourth Circuit upheld the Corps' jurisdiction in a case with similar facts. Soon afterward, in October 2004, the litigants in the *RGM* case agreed to a settlement, which included obtaining a court order vacating Judge Morgan's original judgment. Also under the settlement agreement, Precon pledged to seek permits for any future impacts to "alleged waters of the United States," but reserved the right to challenge the Corps'

---

2. All citations to the Record refer to the Certified Administrative Record submitted by the Corps [Docs. 14–33] and agreed on by the parties.

3. Although Plaintiff's brief described Saint Brides Ditch as "ephemeral," (Pl.'s Br. at 7), Plaintiff's counsel conceded at oral argument that the current administrative record uniformly depicts Saint Brides Ditch as "perennial."

jurisdiction under the CWA. (R. at 0032_001–005.)

Since the settlement agreement, Precon has submitted two separate permit applications under Section 404 of the CWA. The first application, originally submitted on August 4, 2005, requested authorization for a residential development in the northern portion of Edinburgh. (R. at 0055_1_008.) The project, known as Edinburgh CC2a ("Project CC2a"), claimed a potential impact on 2.174 acres of wetlands, but the plans attached to the application suggested an impact on approximately 100 acres of wetlands, including the 4.8 acre Site Wetlands. (R. at 0055_1_026.) After a meeting on April 18, 2006, the Corps communicated it was "relying on [Precon's] intent not to develop additional areas on the [Edinburgh] property to move forward with the processing of the proposed impacts in CC2a. . . ." (R. at 0082_001.)[4] On June 27, 2006, the Corps granted the CC2a permit to allow the impact on the 2.174 acres of wetlands. (R. at 0103_001.)

Precon submitted a second permit application on December 29, 2006, requesting authorization to develop more of Edinburgh and impact another 10.7 acres of wetlands. (R. at 0108_001.) This proposed project, known as CC1b, involved both residential development and the creation of a recreational facility. (R. at 0108_01_010.) Precon subsequently deleted the recreational facility from the proposal, but Project CC1b still includes the 4.8 acres of wetlands at issue, the Site Wetlands. Precon requested a jurisdiction determination ("JD"), and on May 31, 2007, the Corps concluded that the Site Wetlands were subject to jurisdiction un-

der the CWA. Precon appealed the JD, and an administrative appeals conference was held on September 13, 2007. During the pendency of the JD appeal, the Corps denied Precon's permit application to impact the Site Wetlands. Precon appealed the permit denial, and another administrative appeals conference was held on October 30, 2007.

On December 10, 2007, the Corps' appeals officer remanded the JD back to the Corps' Norfolk District to reconfirm jurisdiction under the CWA, using the Corps' written guidance issued subsequent to the U.S. Supreme Court's decision in *Rapanos v. United States,* 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). On June 2, 2008, the Corps' Norfolk District reconfirmed that the Site Wetlands were subject to jurisdiction under the CWA, and in July 2008, the Corps' appeals officer upheld the denial of Precon's permit application.

Having exhausted all administrative avenues for relief, Precon filed suit against the Corps in the U.S. District Court for the Eastern District of Virginia, on September 18, 2008, requesting this Court to (1) enter a declaratory judgment holding that the Site Wetlands are not subject to federal jurisdiction under the CWA, and in the alternative, (2) "set aside the Corps' permit denial and direct the Corps to issue a permit to allow the proposed activities." (Compl. [Doc. 1] at 12–13.)

Months later, both parties filed for summary judgment pursuant to the procedure prescribed by the Court's Amended Scheduling Order. [Doc. 38.] On March 6, 2009, Precon moved this Court for summary judgment [Doc. 39] and filed a mem-

---

**4.** Pursuant to regulation, the Corps required Precon to submit a comprehensive permit application, which enumerates "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project and for which a [404 permit] would be re-

quired." 33 C.F.R. § 325.1(d)(2). Furthermore, in a letter to the Corps, Precon's attorney stated, "the Applicants have no interest in seeking a permit for any development beyond the CC2A Development now or in the foreseeable future." (R. at 0075_001.)

orandum in support ("Pl.'s Br." [Doc. 40] ). On April 17, 2009, the Corps filed a Cross Motion for Summary Judgment [Doc. 41] and a Memorandum in Support of its Cross Motion for Summary Judgment and in Opposition to Plaintiffs Motion for Summary Judgment ("Def.'s Br." [Doc. 42] ). On May 29, 2009, Precon filed a Reply Brief ("Pl.'s Rep. Br." [Doc. 43] ), and on June 19, 2009, the Corps filed its Reply Brief ("Def.'s Rep. Br." [Doc. 45] ).

On July 22, 2009, the Court ordered a hearing be held for argument on the cross motions for summary judgment, and authorized both parties to submit additional briefing limited to the issues of (1) the standard of deference owed to agency action, and (2) the proper review area for the Corps' JD. [Doc. 47.] Precon and the government filed their supplemental briefs on August 3, 2009. ("Pl.'s Supp. Br." [Doc. 48] and "Def.'s Supp. Br." [Doc. 49], respectively.) The Court heard oral argument on the cross motions for summary judgment on August 4, 2009. Douglas E. Kahle, Esq., and Mark R. Baumgartner, Esq., represented the Plaintiff. Kent E. Hanson, Esq., Craig P. Wittman, Esq., and Austin D. Saylor, Esq., represented the Defendant. The Official Court Reporter was Sue Ash. This matter is now ripe for adjudication.

### III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must view the facts,

and inferences to be drawn from the facts, in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. 2505. Finally, either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits" to support or rebut a summary judgment motion. Fed. R.Civ.P. 56(c).

### IV. DISCUSSION

#### A. Corps' Jurisdiction Under the Clear Water Act

##### 1. "Waters of the United States" and *Rapanos*

Congress enacted the Clean Water Act ("CWA") in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2009). In relevant part, the CWA prohibits "the discharge of any pollutant by any person," except in compliance with the CWA. 33 U.S.C. § 1311(a). "[D]ischarge of any pollutant" is broadly defined to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). More specifically, the CWA defines "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

In *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), the U.S. Supreme Court issued a split decision interpreting "navigable waters," and in turn, "waters of the United States." The Court vacated the lower courts' holding that the Corps had jurisdiction over the wetlands at issue, and remanded for reconsideration pursuant to the appropriate legal standard. The problem plaguing the lower courts, however, is that the appropriate legal standard is not clear from the text of the Court's opinion. Justice Scalia, writing for the plurality, put

forth the following two-prong test for whether a wetland constitutes navigable water within the meaning of the CWA:

First, that the adjacent channel contains a "wate[r] of the United States," (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

*Id.* at 742, 126 S.Ct. 2208 (Scalia, J., plurality opinion). Justice Kennedy concurred in the judgment, but formulated his own standard whereby "the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id.* at 779, 126 S.Ct. 2208 (Kennedy, J., concurring in the judgment). More specifically:

[W]etlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id.* at 780, 126 S.Ct. 2208. Finally, the dissent would have upheld the Corps' jurisdiction in the wetlands at issue, stating that Justice Kennedy's "significant nexus" test should be "categorically satisfied as to wetlands adjacent to navigable waters or their tributaries." *Id.* at 807, 126 S.Ct. 2208 (Stevens, J., dissenting). In an effort to clarify guidance for the lower courts, Justice Stevens proposed that the Corps possesses jurisdiction in all cases "in which *either* the plurality's or Justice Kennedy's

test is satisfied." *Id.* at 810, 126 S.Ct. 2208 (emphasis added).

Upon a review of the case law, however, the federal circuits have not uniformly agreed on the appropriate test. In the Eleventh Circuit, "Justice Kennedy's 'significant nexus' test provides the governing rule of *Rapanos*." *United States v. Robison,* 505 F.3d 1208, 1221 (11th Cir.2007). The Seventh and Ninth Circuits announced Justice Kennedy's test as the controlling standard, as applied to the facts of their respective cases, but did not rule out an application of the plurality's test in a "rare case." *United States v. Gerke Excavating, Inc.,* 464 F.3d 723, 725 (7th Cir. 2006) ("Justice Kennedy's proposed standard ... must govern the further stages of *this litigation* ....") (emphasis added); *see also N. California River Watch v. City of Healdsburg,* 496 F.3d 993, 999–1000 (9th Cir.2007) ("Justice Kennedy's concurrence provides the controlling rule of law *for our case.*") (emphasis added). According to the First and Eighth Circuits, however, the Corps can prove jurisdiction in any case by meeting "*either* the plurality's *or* Justice Kennedy's standard." *United States v. Johnson,* 467 F.3d 56, 66 (1st Cir.2006) (emphasis added); *see also U.S. v. Bailey,* 571 F.3d 791 (8th Cir.2009). Also, the Fifth and Sixth Circuits declined to choose a controlling standard, because the waters at issue in those cases satisfied the tests of both Justice Kennedy and the plurality. *United States v. Lucas,* 516 F.3d 316, 327 (5th Cir.2008); *United States v. Cundiff,* 555 F.3d 200, 210 (6th Cir. 2009).

Due to the procedural history of the present case, however, the Court need not resolve the split of the foregoing authority. Specifically, as the government acknowledges, the Court should not implement the plurality's standard "[b]ecause the Corps did not reach a final determination with

respect to the application of the plurality standard to the 4.8 acres of wetlands." (Gov.'s Br. at 40.) Thus, the Corps' jurisdiction over the wetlands at issue turns solely on whether the wetlands satisfy the significant nexus requirement dictated by Justice Kennedy.[5]

## 2. Deference Under *Chevron* and *Skidmore*

■ The next issue involves the level of deference owed to the Corps' agency determination of jurisdiction. The government argues that the Corps' determination of jurisdiction is entitled to the high level of deference mandated by the Administrative Procedure Act ("APA"), in 5 U.S.C. § 706(2)(A).[6] In slight contrast, the Plaintiff contends that the reviewing court must "identify substantial evidence supporting the Corps' claims" in order to conclude jurisdiction exists. (Pl.'s Reply Br. at 3) (quoting *Rapanos*, 547 U.S. at 786, 126 S.Ct. 2208) (Kennedy, J., concurring in the judgment) (citing 5 U.S.C. § 706(2)(E)). Thus, as a practical matter, both parties

agree that the APA governs the Corps' determination of jurisdiction. After a review of the case law, however, it is not clear that the APA provides the appropriate legal standard of review.

The *Rapanos* decision fails to provide clear guidance. Although the dissent explicitly calls for a direct application of "*Chevron* deference,"[7] *Rapanos*, 547 U.S. at 788, 793, 811, 126 S.Ct. 2208 (Stevens, J., dissenting), the plurality and concurring opinions only complicate the issue. In formulating his two-prong test for jurisdiction, Justice Scalia shows very little deference to the EPA's regulation, but at the same time buries a single citation to *Chevron* in the middle of his opinion. *Id.* at 739, 126 S.Ct. 2208 (Scalia, J., plurality opinion) ("Corps' expansive interpretation of the 'the waters of the United States' is thus not 'based on a permissible construction of the statute.' ") (citing *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Chief Justice Roberts, however, rejected an application of *Chevron* deference, because the EPA's "proposed rulemaking [following the previ-

5. Contrary to the government's assertion, if jurisdiction fails under the significant nexus test, a remand to the Corps (for an agency determination of jurisdiction under the plurality's test) would not be appropriate. A remand would constitute a legal "mulligan" and provide an improper incentive for the government to base future agency determinations of jurisdiction on only one of the two tests, thereby garnering a "second shot" when an Article III court rejects jurisdiction on the first test. Such game playing is an inefficient use of judicial resources and an unfair disadvantage to landowners who would rather develop their land than litigate into perpetuity.

6. Under Section 706(2)(A), a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...."

7. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104

S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Natural Resources Defense Council challenged an EPA regulation that interpreted key language of the Clean Air Act. After finding the Act's relevant language ambiguous, the Supreme Court upheld the EPA's regulation and stated that an agency's interpretation of the statute it administers deserves deference. *Id.* at 861–62, 865–66, 104 S.Ct. 2778. Specifically, the Court established a high standard of deference based on the agency's legislative authority. For example, if Congress makes "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," then "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. 2778. And even if the delegation of authority to the agency is "implicit," the standard of deference remains high: "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. 2778.

ous Supreme Court ruling that rejected the Corps' jurisdiction under the current CWA regulations] went nowhere." *Id.* at 757–58, 126 S.Ct. 2208 (Roberts, C.J., concurring in the plurality opinion). Finally, Justice Kennedy ignores *Chevron* deference,[8] and instead, cites the APA, once, without explanation, to support his proposition that "a reviewing court must identify substantial evidence supporting the Corps' claims." *Id.* at 786, 126 S.Ct. 2208 (Kennedy, J., concurring in the judgment) (citing 5 U.S.C. § 706(2)(E)). In sum, the *Rapanos* decision leaves the lower courts to resolve the issue on their own. Accordingly, the Undersigned will examine the APA and the *Chevron* decision in turn.

First, with respect to the issue of jurisdiction, the prevailing interpretations of the APA, 5 U.S.C. § 706(2), create a paradox. Under Subsection (A), agency findings "may be set aside if found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting 5 U.S.C. § 706(2)(A)). Pursuant to Subsection (C), however, a reviewing court owes no deference to agency findings that "exceed [statutory] jurisdiction." *United States v. Mead Corp.,* 533 U.S. 218, 227 n. 6, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing 5 U.S.C. § 706(2)(C)). Thus, the competing provisions render the following unworkable standard: the Corps' finding of jurisdiction is entitled to deference unless the Corps lacks jurisdiction.

Second, the "substantial evidence" standard, provided by Subsection (E), should not apply to the Corps' Norfolk District determination of jurisdiction, either. Under the plain language of the statute, Subsection (E) applies to "case[s] subject to sections 556 and 557 of this title [formal adjudications] or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). The Corps' decision, however, was not based on a formal adjudicatory hearing. As the Fourth Circuit has previously held, "the EPA's determination is not required to be made on the record of a hearing," and as a result, " § 706(2)(E) does not apply to [the EPA's] § 404(c) determinations." *James City Cty. v. Envtl. Prot. Agency,* 12 F.3d 1330, 1337 n. 4 (4th Cir.1993) (reviewing Corps' denial of dam permit under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A)). The government relies on the *James City County* decision to argue that the arbitrary and capricious standard of Section 706(2)(A) governs the entirety of this Court's review, but such reliance is misplaced. The *James City County* court's holding applied Section 706(2)(A) to the Corps' *permit* determinations,[9] but did not address the issue of a *jurisdiction* determination under the CWA. The distinction is important. When the Corps made its jurisdiction determination based on the CWA in the present case, it arguably employed "construction of the statute which it administers," within the meaning of the Supreme Court's decision in *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Interestingly, *Chevron* deference shares common language with the APA,

---

8. In a historical review of the Supreme Court's jurisprudence on the Clean Water Act, *Rapanos,* 547 U.S. at 765–67, 126 S.Ct. 2208, Justice Kennedy acknowledges that the Court cited *Chevron* in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), but Justice Kennedy does not cite *Chevron* a single time

in the body of his own legal analysis or conclusion.

9. Accordingly, if jurisdiction exists, this Court will then review the Corps' denial of Plaintiffs permit under the legal standard provided by Section 706(2)(A). See Section B of this Report.

but the *Chevron* opinion neither quotes nor references the statute a single time. Thus, the Undersigned concludes that *Chevron* and its progeny, rather than the APA, provide the governing framework "[w]hen a court reviews an agency's construction of the statute which it administers." [10] *Id.* Furthermore, under this framework, as refined by subsequent case law, the question becomes whether the EPA's current jurisdiction determination—as executed by the Corps—is actually entitled to *Chevron* deference.

▉▉▉ The comprehensive scope of *Chevron* deference is not well settled law,[11] but specific categories of agency action can serve as judicial guideposts. For example, it is clear that *Chevron* deference applies when an administering agency interprets its statute in "a formal adjudication or notice-and-comment rulemaking." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Conversely, "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference." *Id.* Similarly, when an agency interprets its own

*regulation, Chevron* deference is likely not appropriate. *Id.* at 588, 120 S.Ct. 1655 (rejecting an application of *Chevron* deference to Department of Labor's opinion letter that interpreted a Department of Labor regulation); *but see Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)(reviewing Secretary of Labor's informal interpretation of his agency's regulations, in an *amicus brief*, under the functional equivalent of *Chevron* deference). Accordingly, this Court should first determine if any of the aforementioned categories control the present case. Specifically, when the Corps made its jurisdiction determination, the Corps relied on a construction of the CWA, a construction of the statute it administers. Thus, the issue is whether the agency adopted the relevant construction of the statute in "a formal adjudication or notice-and-comment rulemaking" or in an informal manner that "lack[s] the force of law." *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655: *see also Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164.

Because the Corps did not adopt its construction of the statute in a formal adjudication,[12] the Corps' interpretive reg-

---

10. The EPA administers the CWA, as provided in 33 U.S.C. § 1251(d): "Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency ... shall administer this chapter [the CWA]."

11. As the Seventh Circuit has noted, the issue is a "tricky question," since "courts generally do not explain why *Chevron* does or does not govern a particular case ...." *Bob Evans Farms, Inc. v. Nat'l Labor Relations Bd.*, 163 F.3d 1012, 1016, 1019 (7th Cir.1998). Moreover, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, [which] ... has produced a spectrum of judicial responses." *United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

12. The Corps' jurisdiction determination is not a "formal adjudication" within the meaning of *Christensen* or *Mead*. The process of the decision did not involve a hearing, the examination of witnesses, or the formal briefing of factual and legal issues. Furthermore, there is no evidence to suggest that Congress intended the highest level of deference for these informal jurisdiction determinations. In fact, an application of *Chevron* deference in this context would short circuit the notice-and-comment rulemaking system. For example, if an agency were able to base an informal adjudication on an internal document's construction of the statute, and *Chevron* deference applied, then the internal document would wield the same policy-making power as a formally passed regulation. This result contradicts the Supreme Court's less deferential treatment of "policy statements, agency manuals, and enforcement guidelines." *Christen-*

ulation, 33 C.F.R. part 328, provides the most plausible argument for *Chevron* deference. In the "Summary of Findings" of its jurisdiction determination of June 2, 2008, the Corps concluded: "There [a]re '*waters of the U.S.*' within Clean Water Act (CWA) jurisdiction (as defined by 33 CFR part 328) in the review area." (R. at 0157_1_001)(emphasis in original.) After the *Rapanos* decision, however, reliance on 33 C.F.R. part 328 is misplaced. First, Justice Scalia held that the regulations were "not 'based on a permissible construction of the statute.' " *Rapanos*, 547 U.S. at 739, 126 S.Ct. 2208 (Scalia, J., plurality opinion) (citing *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Second, there is no evidence that the relevant regulations have changed since *Rapanos* was decided. Furthermore, even at the time of the *Rapanos* decision, the Corps had failed to amend these regulations, in final form,[13] since the previous landmark decision in *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (hereinafter *"SWANCC"*), where the Court had struck down the Corps' interpretation of jurisdiction under the CWA. *Id.* at 757–58, 126 S.Ct. 2208 (Roberts, C.J., concurring). For Chief Justice Roberts, the consequence of this failure to amend the battle-scarred regulations was a forfeiture of deference:

> Rather than refining its view of its authority in light of our decision in *SWANCC*, and providing guidance meriting deference under our generous standards, the Corps chose to adhere to its essentially boundless view of the scope of its power. The upshot today is another defeat for the agency.

*Id.* at 758, 126 S.Ct. 2208. The same rationale remains persuasive today. The Corps had not amended the relevant regulations by the time it made the jurisdiction determination for Plaintiff's property. Based on the Supreme Court's rejection of these stagnant regulations in both *SWANCC* and *Rapanos*, the Corps' reliance on 33 C.F.R. Part 328 does not merit *Chevron* deference on judicial review.

Next, this Court must determine whether the Corps' jurisdiction determination is entitled to *any* deference. In finding jurisdiction, the Corps applied the significant nexus test as formulated by the agency's internal *"Rapanos* Guidance"[14] and "Instructional Guidebook."[15] (R. at 0157_1_007.) Under the Supreme Court's categorical framework, these internal guides are tantamount to "policy statements, agency manuals, and enforcement

---

*sen*, 529 U.S. at 587, 120 S.Ct. 1655, and offends the strict procedural requirements for passing federal regulations.

13. In 2003, The Corps and EPA initiated a rulemaking to clarify the scope of waters within the jurisdiction of the CWA. 68 Fed. Reg. 1991 (2003). Unfortunately, "[t]he proposed rulemaking went nowhere." *Rapanos*, 547 U.S. at 758, 126 S.Ct. 2208 (Roberts, C.J., concurring).

14. The Administrative Record refers to, but does not contain, the *"Rapanos* Guidance" document relied on by the Corps in making its jurisdiction determination of June 2, 2008. The government, in its brief, provides a web-site for the document, (Def.'s Br. at 4), but the website posts a version of the document, dated December 2, 2008, created *after* the Corps made the jurisdiction determination for Plaintiff's property. Thus, on August 6, 2009, the Court ordered that the earlier, relevant version of the *"Rapanos* Guidance" be filed in the case. Accordingly, the *"Rapanos* Guidance," dated June 5, 2007, is filed as Document Number 52.

15. "The U.S. Army Corps of Engineers Jurisdictional Determination Form Instructional Guidebook" (hereinafter "Instructional Guidebook") can be found at: http://www.usace.army.mil/CECW/Documents/cccwo/reg/cwa_guide/jd_guidebook_051207final.pdf

guidelines, all of which lack the force of law[, and] do not warrant *Chevron*-style deference." *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655. In fact, the government concedes that the Corps' internal guidance documents lack the force of law. (Def.'s Br. at 3–4 n. 2.) Despite the absence of *Chevron* deference, however, the Corps' "*Rapanos* Guidance" and "Instructional Guidebook" deserve *some* deference. Specifically, "interpretations contained in formats such as opinion letters [and agency manuals] are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [65 S.Ct. 161, 89 L.Ed. 124] … (1944), but only to the extent that those interpretations have the power to persuade." *Id.* (quoting *Skidmore* ). As recently revived, "*Skidmore* deference" provides the following standard of review:

> The weight accorded to an administrative judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161) (internal quotations omitted).[16]

■ Finally, a clear line must be drawn between judicial review of: (1) an agency's interpretation of a statute that it administers; and (2) factual determinations made by the agency in the course of carrying out its duties under the statute. Specifically, this court will apply *Skidmore* deference to the analytical *structure* of the Corps' jurisdiction determination, and uphold this analysis if it has "the power to persuade." *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (internal quotations omitted). Agency fact finding, however, is entitled to a greater level of deference. Under the APA, the Corps' factual findings, such as field data, observations, and calculations, shall not be set aside unless "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A); see *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 375–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (holding that Section 706(2)(A)'s "arbitrary and capricious standard" applies to the "classic example of a factual dispute the resolution of which implicates substantial agency expertise"). In

---

**16.** It should be noted that the Corps' "*Rapanos* Guidance" acknowledges and interprets the Supreme Court's decision in *Rapanos.* Although some federal circuit case law calls for *de novo* review when reviewing agency interpretations of judicial precedent, these cases are not controlling. *See, e.g., Blackburn v. Reich,* 79 F.3d 1375 (4th Cir.1996); *Akins v. Fed. Election Comm'n,* 101 F.3d 731 (D.C.Cir.1997)(*overruled on other grounds* ). In *Blackburn,* for example, the Fourth Circuit applied *de novo* review to the Secretary of Labor's administrative order on appeal, in which the Secretary relied *solely* on judicial precedent from the Sixth Circuit to interpret a federal statute pertaining to damages. 79 F.3d at 1377. In particular, the court stated that "[b]ecause the Secretary based his decision in the instant case on judicial precedent rather than his own interpretation of the statute, we owe no more deference than we would any lower court's analysis of the law."

*Id.* at 1377 n. 1 (internal quotations omitted). The *Blackburn* case does not compel *de novo* review in the instant case, however, for two reasons. First, the Fourth Circuit decided *Blackburn* prior to the *Christensen* decision, in which the Supreme Court pronounced that *Skidmore* deference is a viable standard in the absence of *Chevron* deference. *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655. Second, in the "*Rapanos* Guidance" and "Instructional Guidebook," the Corps extrapolates beyond a mere recitation of the *Rapanos* opinion to incorporate practical standards into more comprehensive guidance, including illustrative diagrams, for engineers in the field. Thus, the Corps has implemented "the 'specialized experience and broader investigations and information' available to the agency," which merits *Skidmore* deference, rather than no deference. *Mead,* 533 U.S. at 234, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 139, 65 S.Ct. 161).

both *Marsh* and the present case, "[b]e-cause analysis of the [Corps' impact state-ments, reports, and surveys] requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Id.* at 377, 109 S.Ct. 1851; *see also Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)("[A] reviewing court must remember that [when] the [agency] is making predictions, within its area of special expertise, at the frontiers of sci-ence . . ., as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."). With these prin-ciples in mind, the Court now turns to whether the Plaintiffs wetlands are subject to jurisdiction under the CWA.

### 3. Whether Jurisdiction Under the CWA Exists

■ Under Justice Kennedy's test, the Corps' jurisdiction over Plaintiff's wetlands requires "the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Rapanos,* 547 U.S. at 779, 126 S.Ct. 2208 (Kennedy, J., concurring in the judgment). More specifically:

> [W]etlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wet-lands, either alone or in combination with similarly situated lands in the re-gion, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wet-lands' effects on water quality are specu-lative or insubstantial, they fall outside the zone fairly encompassed by the stat-utory term "navigable waters."

*Id.* at 780, 126 S.Ct. 2208. Thus, as a practical matter, the Corps can define its review area to include Plaintiff's wetlands "in combination with *similarly situated tends* in the region." *Id.* (emphasis add-

ed). In its jurisdiction determination of June 2, 2008, the Corps defined the review area to include 448 acres of wetlands. (R. at 0160_00_006.) The threshold issue be-comes, therefore, whether the Corps im-properly enlarged the review area beyond the scope of "similarly situated" wetlands.

#### a. Review Area

Plaintiff argues that the Corps' deviation from its own guidance documents in defin-ing the review area was "arbitrary and capricious," and thus, grounds for reversal. (Pl.'s Rep. Br. at 15–17 n. 8.) Furthermore, Plaintiff asserts that the guidance docu-ments, as "the only agency interpretation of the term 'similarly situated,'" compel strict application. (Pl.'s Supp. Br. at 7.) In particular, Plaintiff relies heavily on Illus-tration Number 4 of the Instructional Guidebook, claiming it "fits Precon's cir-cumstances to an uncanny degree." *Id.* Reliance on the guidance documents, how-ever, is misplaced for two significant rea-sons. First, the Corps is not legally bound by agency guidance documents. As the *"Rapanos* Guidance" clearly states:

> This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. It does not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situa-tion depending on the circumstances.

(Rapanos Guidance, June 5, 2007 [Doc. 52] at 4 n. 16.) *See also U.S. v. Moses,* 642 F.Supp.2d 1216, 1226 (D.Idaho 2009) (stat-ing, in dicta, "the guidance memorandum is just that-a guidance memorandum"). Second, Illustration Number 4 is not an "uncanny" mirror image of the Site. Ac-cording to its heading, the illustration clearly pertains to a "[p]roject involv[ing] a wetland adjacent to a tributary with *non*-RPWs [*non* relatively permanent waters]." (Instructional Guidebook, May 30, 2007, at 43) (emphasis added). In contrast, the

Administrative Record characterizes both relevant ditches as relatively permanent waters (RPWs). (R. at 0160_01_009) (finding that "the waterbody adjacent to the 166 acre wetland ... [is] relatively permanent along its entire length," even though Saint Brides Ditch is "perennial" and the 2,500 foot Ditch is "seasonal"). Although Plaintiff disagrees with the characterization, Plaintiff failed to supply the Record with any evidence to the contrary, such as an expert opinion. Moreover, the Corps' factual finding, involving a matter within its "area of special expertise," is entitled to a great level of deference from this Court. *See Baltimore Gas*, 462 U.S. at 103, 103 S.Ct. 2246. Thus, Illustration Number 4, which is not even binding on the Corps,[17] does not pertain to the intersection of the 2,500 foot Ditch and Saint Brides Ditch, because both ditches are RPWs.

The Corps deviated from the optional framework of the guidance documents in defining the relevant reach, but the Corps documented its reasons and rationale for doing so. First, the Corps noted that "[m]ultiple man-made or manipulated drainage ditches have been constructed throughout the drainage area to carry minor flow to the Saint Brides Ditch, especially in residential areas, thus confounding stream order determinations" for purposes of calculating the relevant reach. (R. at 0160_01_008.) As a result, the Corps based its relevant reach determination on "naturally defined geographic features." *Id.* Next, based on these geographic features, the Corps "determined that the entire channel [including both Saint Brides Ditch *and* the 2,500 foot Ditch] adjacent to the 166 acre on site wetland is a man-altered, first-order trib-utary to the Northwest River." *Id.* According to the Record, this first-order tributary flows 3.11 miles before intersecting with the next first-order tributary, thus "mark[ing] the downstream limit of the relevant reach." *Id.*

Furthermore, the scope of the review area is not limited by stream order determinations. Justice Kennedy states that the review area can include "similarly situated lands in the region ...." *Rapanos,* 547 U.S. at 780, 126 S.Ct. 2208. Based on examinations of the Site performed by other experts (R. at 0160_01_017), in addition to its own examination, the Corps concluded that "these 166 acres [from the stream order analysis] are part of a much larger system and despite recent perturbations, continue to function as part of the entire 447.76 acres of similarly situated wetlands within the relevant reach." (R. at 0160_01_020.) Specifically, the entirety of the 448 acres "belongs to a class of wetlands known as mineral flats" (R. at 0160_01_019), which function in concert to provide "water storage, flow attenuation, floor desynchronization, carbon sequestration, nutrient cycling, pollutant/particulate removal, and wildlife habitat support." (R. at 0160_01_019.) In light of "the thoroughness evident in [the Corps'] consideration" and "the validity of [the Corps'] reasoning," this Court finds that the 448 acre review area is persuasive within the meaning of *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. Accordingly, we next address the issue of whether a significant nexus exists between these 448 acres of wetlands and traditional navigable waters.

17. In fact, if Illustration Number 4 were binding, it would offend the scientific integrity of the analysis. For example, as the government explained at oral argument, strict application of the illustration would enable a property owner to reduce the acreage of wetlands within the relevant reach of a tributary by merely digging a ditch to intersect the tributary nearby, downstream. Common sense dictates that the Corps' methodology must be sufficiently flexible to arrive at the best *scientific* conclusion.

### b. Significant Nexus

According to Justice Kennedy, wetlands possess the requisite significant nexus if they "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780, 126 S.Ct. 2208. Plaintiff challenges the Corps' impact findings as impermissibly speculative and argues that a nexus determination *must* be "supported by specific, measurable criteria. . . ." (Pl.'s Br. at 21.) In particular, Plaintiff requires that a mathematical line be drawn in the sand for pollutant levels, relying on the following language from the Justice Kennedy's opinion: "Absent some measure of the significance of the connection for downstream water quality, this standard [mere hydrologic connection] was too uncertain." *Rapanos*, 547 U.S. at 784, 126 S.Ct. 2208. When put in proper context, however, this passage does not mandate a quantitative clement to establish a significant nexus. Instead, a "measure of the significance" is only necessary when the Corps attempts to rely on a "mere hydrologic connection." [18] *Id.* at 784–85, 126 S.Ct. 2208. By contrast, in the present case, the Corps does *not* rely solely on the hydrologic connection between wetlands and tributaries, but rather, bases the nexus on: (a) water storage, flow attenuation, and flood desynchronization; (b) biogeochemical processes; (c) carbon sequestration; (d) denitrification; (e) pollutant removal and retention; and (f) the effect on wildlife and habitat. (R. at 0160_01_020–025.) Thus, neither statute nor case law requires the Corps to prove a significant

nexus by a specific quantitative measurement. *See also Cundiff*, 555 F.3d at 211 (rejecting "that a 'significant nexus' may only be proved by 'laboratory analysis' of soil samples, water samples, or through other tests").

Even without quantitative measurements attached to each factor considered, the Corps' factual findings linking the wetlands to the Northwest River are substantial. First, the Record indicates that the "storage capacity [of the relevant reach] helps prevent downstream flooding," which "greatly moderates the effect of flood flows upon the Northwest River . . ." (R. at 0160_01_012.) Second, "[p]ollutants are . . . stored, along with sediment, in Saint Brides Ditch, rather than traveling downstream to the Northwest River. . . ." (R. at 0160_01_013.) Third, loss of the wetlands "would increase the rate of runoff, . . . which would result in downstream flooding problems [and] . . . erosion of sediments, increasing sedimentation and pollution of downstream waters including the Northwest River." (R. at 0160_01_021.) Fourth, the wetlands' "conversion of nitrogen upstream helps prevent the deposition of nitrogen into . . . the Northwest River." (R. at 0160_01_023.) Fifth, the wetlands' microtopographic complexity[,] . . . in combination with water storage functions, maximizes the removal of pollutants and the retention of particulates before these constituents reach the Northwest River." *Id.* Sixth, the "[t]he loss of these wetlands in the watershed would have a substantial negative impact on . . . biological communities of the river's ecosystem." (R. at

---

18. Under Plaintiff's interpretation of Justice Kennedy's words, "providing habitat, sediment trapping, nutrient recycling, and flood peak diminution" is insufficient "absent some *measure* of the significance. . . ." (Pl.'s Rep. Br. at 5)(emphasis in original)(internal citations omitted). But Plaintiff improperly conflates the *Rapanos* District Court's factual findings with the distinct legal standard set forth by the Court of Appeals. Justice Kennedy "rejected" the latter as an inappropriate standard, but stated that the former was potentially sufficient to establish a significant nexus. *See Rapanos*, 547 U.S. at 783–85, 126 S.Ct. 2208.

0160_01_027.) In light of these factual findings, which receive the highest level of deference, *Baltimore Gas*, 462 U.S. at 103, 103 S.Ct. 2246, the wetlands' effect on the water quality of the Northwest River is neither "speculative" nor "insubstantial." *Rapanos*, 547 U.S. at 780, 126 S.Ct. 2208. Accordingly, the Court should uphold the Corps' finding of jurisdiction under the CWA, and thus, address the merits of the permits denial.

## B. Denial of the Permit

### 1. Standard of Review

The Corps' permit determinations under Section 404 of the CWA shall not be set aside unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also James City Cty.*, 12 F.3d at 1337 n. 4. Clear longstanding precedent dictates that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although the Corps "must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *id.*, the choice must stand unless "the agency has committed a clear error of judgment." *Maryland Dept. of Human Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1475 (4th Cir.1992)(quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### 2. Whether the Denial of the Permit Was Arbitrary and Capricious

The Corps denied Plaintiff's permit request on two independent grounds: (1) availability of practicable alternatives, as defined by Section 404(b) of the CWA; and (2) Plaintiff's proposed project is contrary to the public interest. The Court will address each ground, in turn.

#### a. Practicable Alternatives

Under Section 404 of the CWA, the Corps may issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In considering permits, the Corps must apply the guidelines ("Section 404(b)(1) Guidelines") promulgated by the EPA as regulations. 33 U.S.C. § 1344(b)(1). In relevant part, the Section 404(b)(1) Guidelines dictate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem...." 40 C.F.R. § 230.10(a). Furthermore, if a non-water dependent activity proposes discharge on a "special aquatic site," then "practicable alternatives that do not involve special aquatic sites are *presumed to be available*, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3)(emphasis added). Thus, the threshold issue is whether the Site, in the present case, constitutes a "special aquatic site" within the meaning of the regulations.

The regulations define "special aquatic site" to include "wetlands," 40 C.F.R. § 230.41,[19] but Plaintiff argues that the

---

19. Section 230.3 provides that "[s]pecial aquatic sites means those sites identified in subpart E," and Section 230.10(a)(3) classifies special aquatic sites "as [those] defined in Subpart E." In turn, Subpart E defines special aquatic sites to include the following: (1)

sanctuaries and refuges, 40 C.F.R. § 230.40; (2) wetlands, 40 C.F.R. § 230.41; (3) mud flats, 40 C.F.R. § 230.42; (4) vegetated shallows, 40 C.F.R. § 230.43; (5) coral reefs, 40 C.F.R. § 230.44; and (6) riffle and pool complexes, 40 C.F.R. § 230.45.

Site Wetlands are not wetlands of the "special aquatic" sort. Specifically, Plaintiff claims that "special aquatic sites" include only those wetlands "adjacent to open water." (Pl.'s Br. at 26) (citing 40 C.F.R. § 230.41). Section 230.41(a)(2) states, "Where wetlands are adjacent to open water, they generally constitute the transition to upland." However, neither this language, nor any other language in the Section 404(b)(1) Guidelines, explicitly limits the scope of "wetlands" to those wetlands adjacent to open water. Moreover, Section 230.3(q-l) characterizes special aquatic sites as:

> geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region.

As discussed in Section (A)(3)(b) of this Report, the Corps has outlined in the Record an array of ecological functions served by the Site Wetlands, which "positively contribut[e] to the general overall environmental health" of the entire watershed region. Accordingly, the Corps did not commit a clear error of judgment by treating the Site Wetlands as a "special aquatic site." As a result, there is a legal rebuttable presumption that practicable alternatives are available in lieu of building the 10 residential lots and impacting the Site Wetlands.

Under the regulatory presumption, the burden is on the Plaintiff to "clearly demonstrate[ ]" that no practicable alternatives exist. 40 C.F.R. § 230.10(a)(3). In response to the Corps' invitation to supplement the Record with additional information, Precon submitted an "Alternatives Analysis" document, dated June 25, 2004, which only addresses the Edinburgh property *as a whole,* not tailored to the 10 residential lots at issue. (R. at 0100_3_001 et seq.) Since the presumption of practicable alternatives for the 10 residential lots reasonably includes building the 10 lots elsewhere *within Edinburgh,* (see. e.g., R. at 0125_001), Precon's "Alternatives Analysis" is insufficient, as a matter of law, to rebut the presumption.

In addition to the "Alternatives Analysis"—the only evidence submitted to the Record for rebuttal purposes—Plaintiff attempts to frame the Corps' finding of practicable alternatives as "a draconian decision." (Pl.'s Br. at 23.) According to the Plaintiff, the Corps concluded, in an arbitrary and capricious manner, "that the less damaging practical alternative to Precon's proposal to build houses was to not build houses [at all]." *Id.* In support, the Plaintiff cites, but mischaracterizes, the Corps' letter of June 20, 2007. For example, the letter merely announces the Corps' "preliminary recommendation" to deny the permit and invites Precon to submit additional information into the Record for full consideration. (R. at 0125_001.) Furthermore, the letter communicates the agency's presumption that "offsite alternatives for the 10 proposed lots . . . exist[ ] at other sites in southern Chesapeake . . . [and] that sufficient onsite alternatives, such as eliminating the 10 lots and avoiding impacts to the 4.80 acres of wetlands, are available and practicable." *Id.* Thus, read in its entirety, the letter clearly frames the "alternative" as building houses offsite *or* onsite, so long as there is no impact to the 4.8 acres of wetlands. The point is minor, however, as the regulatory presumption under 40 C.F.R. § 230.10(a)(3) does not require the Corps to identify a specific alternative.

In sum, Plaintiff's proposed building activity on the Site triggers a regulatory presumption that practicable alternatives

exist. Plaintiff has failed to rebut this presumption. Therefore, the Corps did not act arbitrarily or capriciously in denying the permit.[20]

### b. Public Interest

Even if this Court held that no practicable alternatives exist, and further held that the proposed project satisfies the Section 404(b)(1) Guidelines, the permit denial is still valid under a public interest review. According to the regulations, the Corps' "decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). In the present case, the Corps evaluated each factor enumerated by the regulations, (R. 0150_4_004–008), and concluded "that the issuance of a permit would be contrary to the public interest because of the unnecessary loss of wetlands and the potential for cumulative environmental degradation." (R. at 0150_4_011)(internal citations omitted)

Plaintiff identifies 17 factors where the Corps found "no adverse impact" and argues that "the economic impact of the Corps' decision [to deny the permit] is enormous."[21] (Pl.'s Br. at 25.) This argument, however, ignores the factors that the Corps *did* find adversely impacted. Specifically, the Corps determined "that the project would have a substantial, adverse, and avoidable effect on conservation, wet-lands, general environmental concerns, flood hazards, water quality, and fish and wildlife values." (R. at 0150_4_011.) Plaintiff failed to introduce evidence into the Record to controvert the Corps' factual findings, and furthermore, the Corps' factual findings are entitled to a high level of deference. Upon balancing the factors, the Corps found that the potential adverse impact on the environment outweighed the negative economic impact on Precon. The Record provides a rational explanation, based on the facts, for the Corps' decision, (R. at 0150_4_001–011), and therefore, this Court should not set aside the agency action. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43, 103 S.Ct. 2856.

### V. RECOMMENDATION

Under Justice Kennedy's test for CWA jurisdiction, as laid out in *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), the Corps has jurisdiction over the wetlands contained in Precon's proposed residential development. Pursuant to this jurisdiction and the federal regulations governing permits for development, the Corps denied Precon's permit application on two independent grounds: (1) availability of practicable alternatives, as defined by the Section 404(b)(1) Guidelines; and (2) Plaintiff's proposed project is contrary to the public interest. The Record supports

---

**20.** To the contrary, Section 230.10(a) of the regulations *requires* the Corps to deny a permit when a practicable, less ecologically adverse, alternative exists.

**21.** Although the Plaintiff refers to factors outlined by 33 C.F.R. § 320.4, the Plaintiff's argument is structurally ambiguous. For example, on page 25 of its brief, Plaintiff attacks the permit denial on the grounds that (1) "[t]he Corps' analysis fails to include even one measured impact to any navigable in fact water of the United States;" (2) "the econom-ic impact of the Corps' decision is enormous;" and (3) "[t]he Corps' decision was based solely and explicitly on its erroneous application of a regulatory presumption contained in 40 C.F.R. § 230.10(a)(3)." In other words, within the span of one page, Plaintiff has blended together three distinct analyses for jurisdiction, public interest review, and practicable alternatives, respectively, thus demonstrating a misapprehension of the regulatory framework governing the Corps' decisions.

both grounds, and neither ground should be set aside as arbitrary or capricious.

For the foregoing reasons, the Undersigned recommends that Plaintiff's Motion for Summary Judgment be DENIED and further recommends that Defendant's Motion for Summary Judgment be GRANTED. Accordingly, it is recommended that the case be DISMISSED.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carr v. Hutto,* 737 F.2d 433 (4th Cir.1984), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S.

1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).